**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MEDLY HEALTH INC., *et al.*,[1] | ) Case No. 22-11257 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (I)(A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO
STALKING HORSE AGREEMENT AND TO PROVIDE BID PROTECTIONS
THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM
AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE HEARING AND
APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (II)(A)
APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above captioned debtors and debtors in possession (the "Debtors"), hereby file

this motion (the "Motion") with the Court for the entry of: (i) an order substantially in the form

attached hereto as **Exhibit A**, (the "Bidding Procedures Order"), (a) approving bidding procedures,

substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding

Procedures"), to be used in connection with the sale (the "Sale") of substantially all of the Debtors'

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Medly Health Inc. (3391); Care Well Pharmacy, Inc. (9048); Grubbs Care Pharmacy NW Inc. (0490); Marg Pharmacy, Inc. (5838); Medly Atlanta Inc. (7312); Medly Baltimore Inc. (2354); Medly Bedford Ave Pharmacy Inc. (3690); Medly Bristol Inc. (4556); Medly Bronx Inc. (4741); Medly Chicago Inc. (5231); Medly Dallas Inc. (7581); Medly DC Inc. (9403); Medly Enterprise LLC (8898); Medly Grand Central Inc. (1741); Medly Houston Inc. (7443); Medly Jersey City Inc. (5677); Medly Mail Service Pharmacy LLC (9203); Medly Miami Inc. (8101); Medly Orlando Inc. (7581); Medly Pharmacy Inc. (4606); Medly Pharmacy PA Inc. (8494); Medly Pittsburgh Inc. (8381); Medly Queens Inc. (9623); Medly Raleigh Inc. (5140); Medly San Antonio Inc. (9973); Medly Stamford Inc. (4966); Medly Tampa Inc. (5128); Medly UCHC Pharmacy Inc. (6672); Medly Utah Inc. (4648); Pharmaca Integrative Pharmacy, Inc. (0334); Tango340B LLC (4781); and West Campbell Pharmacy Inc. (2931).  The Debtors' business address is 7088 Winchester Circle, Suite 100, Boulder CO 80301.

Pharmaca business and certain other assets (collectively, the "Acquired Assets") to MedPharmaca Holdings, Inc. (the "Stalking Horse Bidder"), or alternatively, to such other bidder that submits the highest and best bid for the Acquired Assets at auction, (b) authorizing the Debtors to provide a break-up fee and expense reimbursement, as provided in the Stalking Horse Agreement (defined below), (c) scheduling an auction of the Acquired Assets and scheduling the hearing to approve the Sale, (d) approving the form and manner of notices of the proposed sale hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, (e) authorizing procedures governing the potential assumption and assignment of the Debtors' certain executory contracts and unexpired leases in connection with the Sale, (each a "Potential Assumed Contract" and together, the "Potential Assumed Contracts"); and (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assumed Contract and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 3; and (ii) an order (a) authorizing the sale of the Acquired Assets free and clear of all liens, claims, interests, and encumbrances provided with such liens, claims, interests and encumbrances to attach to the proceeds of such sale, (b) authorizing the assumption and assignment of Potential Assumed Contracts; and (c) granting related relief.

Concurrent with the ongoing marketing of the Acquired Assets, the Debtors entered into that certain *Asset Purchase Agreement*, dated December 9, 2022 (the "Stalking Horse

Agreement") with the Stalking Horse Bidder attached as **Exhibit B** to this Motion and pursuant to which the Debtors have agreed to sell substantially all of their Assets, subject to higher and better offers.

In support of this Motion, the Debtors rely upon the *Declaration of Richard Willis in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors believe the proposed Bidding Procedures will best facilitate a value maximizing sale of the Acquired Assets for the benefit of the Debtors' estates.  The Bidding Procedures likewise will allow the Debtors additional time to continue to market the Acquired Assets, receive and evaluate bids, and hold an auction (if necessary) to determine the highest or otherwise best bid.  In addition, the marketing process and the Bidding Procedures proposed herein are aligned with the milestones set forth in the proposed *Interim Order Pursuant to 11 §§ U.S.C. 105, 361, 362, 363, 364, and 507(I) Authorizing Debtors to Obtain Secured Superpriority Postpetition Financing, (II) Granting Priming Liens and Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "Interim DIP Order").

2.      The Debtors believe that their continued marketing efforts aided by the Bidding Procedures will provide an efficient postpetition sale process for the Acquired Assets, and that approval of the Bidding Procedures and the related relief requested in this Motion is in the

best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## JURISDICTION AND VENUE

3.     The United States District Court for the District of Delaware has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.     The Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The bases for the relief requested herein are sections 105(a), 363(b), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, 9006-1 and 9013-1(m).

## INTRODUCTION

7.     On December 9, 2022 (the "Petition Date"), the Debtors commenced these

cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases. As of the date hereof, no committee has been appointed in the Debtors' chapter 11 cases.

8.      The Debtors operate four full service digital pharmacies, twenty-one brick-and-mortar, full-service specialty pharmacies serving twenty markets across nine states and one health and wellness store in Seattle, Washington. The Debtors also operate an e-commerce business through their "Pharmaca.com" website. The Debtors offer orchestrated consumer services such as delivery, prior authorization coordination, copay management, refill management and much more. The Debtors' strategic pillars include prescription medications, health and wellness and order fulfilment, including, where available, same day delivery. The Debtors hire expert practitioners and experienced pharmacists who deliver a superior customer experience. As a result, the Debtors are a trusted partner of consumers and doctors.

9.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

## RELIEF REQUESTED

10.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules, the Debtors hereby seek:

(a) entry of the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the following relief:

(i)     authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u>, to be used in connection with the sale of Acquired Assets through the proposed Sale;

(ii)    establishing the following dates and deadlines in connection with the Bidding Procedures:

> a. <u>Bid Deadline</u>: **January 13, 2023, at 4:00 p.m**. (prevailing Eastern time), as the deadline by which all bids to purchase the Acquired Assets must be actually received by the Debtors pursuant to the Bidding Procedures (the "<u>Bid Deadline</u>");
>
> b.  <u>Auction</u>: **January 17, 2023 at 10:00 a.m.** (prevailing Eastern time), as the date by which the Debtors will conduct an auction pursuant to the Bidding Procedures (the "<u>Auction</u>"), if necessary; and
>
> c. <u>Sale Hearing</u>: **January 19, 2023**, as the date for the Court to consider approval of the Sale (the "<u>Sale Hearing</u>").

(iii)   authorizing the Debtors to provide the Stalking Horse Bidder and in accordance with the Stalking Horse Agreement, with (A) a breakup fee in the amount of $450,000 (the "<u>Break-Up Fee</u>") and (B) an expense reimbursement not to exceed $500,000 on account of expenses  incurred by the Stalking Horse Bidder in connection with the Sale (the "<u>Expense Reimbursement</u>" and, together with the Break-Up Fee, the "<u>Bid Protections</u>");

(iv)    approving the form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "<u>Sale Notice</u>");

(v)     approving procedures for the assumption and assignment of the Potential Assumed Contracts in connection with any Sale (the "<u>Assumption and Assignment Procedures</u>");

(vi)    approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract (each, a "<u>Counterparty</u>" and collectively, the "<u>Counterparties</u>") of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the

Bankruptcy Code under the applicable Potential Assumed Contracts (the "Cure Amounts") and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Potential Assumption and Assignment Notice"); and

(b) following entry of the Bidding Procedures Order, approval of the proposed order (the "Sale Order")[2] at the Sale Hearing, authorizing and approving the following:

       (i)     the Sale of the Acquired Assets to the Stalking Horse Bidder or, alternatively, to the Successful Bidder (as defined below) free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreement or the asset purchase agreement with the otherwise Successful Bidder, as applicable;

       (ii)    authorizing the assumption and assignment of the Potential Assumed Contracts in connection with such Sale; and

       (iii)   granting related relief.

## SALE TIMELINE

11.    The Bidding Procedures and the Debtors' proposed timeline for this sale process are a product of good-faith, arm's length negotiations and reflect the best option available for the Debtors to maximize the value of their Acquired Assets under the circumstances. Specifically, the Debtors have agreed to, among others, the following proposed key dates and deadlines to govern the sale process in the proposed Interim DIP Order (the "Milestones"):[3]

| SALE PROCESS KEY DATES AND DEADLINES ||
|---|---|
| **December 22, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to proposed Bidding Procedures (including proposed Bid Protections) and entry of Bidding Procedures Order |

---

[2] The Debtors will file any proposed any proposed Sale Order no later than fourteen (14) days before the Sale Objection Deadline.

[3] Capitalized terms used in this Motion but not previously defined herein shall have the respective meanings ascribed to such terms later in this Motion, the Bidding Procedures attached hereto as Exhibit 1, the Bidding Procedures Order, or Stalking Horse Agreement, as applicable.

| **December 29, 2022** | Hearing to consider approval of Bidding Procedures (including proposed Bid Protections) and entry of Bidding Procedures Order |
|---|---|
| **On or before three (3) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice |
| **On or before two (2) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **As soon as practicable after entry of the Bidding Procedures Order, the Debtors, at their election, shall cause the information contained in the Sale Notice to be published once in either the national edition of _USA Today_ or such publication with similar national circulation** | Deadline to publish notice of Sale |
| **January 8, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for potential bidders to deliver Preliminary Bid Documents |
| **January 13, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for parties to file objections to proposed Sale to Stalking Horse Bidder or Successful Bidder ("Sale Objection Deadline") |
| **January 13, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Counterparties to file objections to Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **January 13, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **January 16, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to select Qualified Bids |
| **January 16, 2023** | Deadline to notify Bidders if they are selected as Qualified Bidders and provide them with notice of Auction |
| **January 17, 2023 at 10:00 a.m. (prevailing Eastern Time)** | Auction (if necessary) |

| **As soon a reasonably practicable following the closing of the Auction but no later than one day following such closing** | Notice of Auction Results |
|---|---|
| **January 19, 2023** | Sale Hearing |

12.     The Debtors, with the assistance of their advisors, will continue to market the Acquired Assets to potential purchasers.  As such, the Debtors believe that prospective bidders will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

13.     Completion of the sale process in a timely manner will also maximize the value of the Acquired Assets obtained through the proposed Sale.  The proposed dates governing the Sale, marketing, and auction process are within the Milestones provided under the Interim DIP Order.  Failure to adhere to the Milestones would constitute a default under the Interim DIP Order. Accordingly, it is in the Debtors' and their stakeholders' best interests to complete a robust sale process as swiftly as possible to consummate the Sale within the parameters set by the Milestones. In view of the foregoing, the Debtors respectfully submit that the Court should grant the relief requested herein and approved proposed timeline for completing the sale, marketing, and auction process for the Acquired Assets.

## **DESCRIPTION OF THE ASSETS**[4]

14.     As described in the First Day Declaration, the Debtors' business operations generally fall along two business lines:  "Medly" and "Pharmaca"  The Debtors'

---

[4] The summary of the provisions of the Stalking Horse Agreement, Bidding Procedures, and Bidding Procedures Order described in this Motion (the "Summary"), is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between the Summary and either the Stalking Horse Agreement, Bidding Procedures or Bidding Procedures Order, as applicable, those documents shall govern in all respects.

Medly pharmacies, of which four remain as of the Petition Date, will close following the

conclusion of the Debtors' sale of related prescription lists and there will be no on-going Medly

operations thereafter.  For the avoidance of doubt, the sale of the related prescription lists for the

Medly pharmacies are not part of the relief requested in this Motion.  The Acquired Assets

subject to this Motion relate to the Debtors' Pharmaca business line.

15.    As set forth in the First Day Declaration, in August 2022, the Debtors'

senior management became aware of certain operational and accounting irregularities conducted

by the Debtors' original founders and certain other related individuals.  After management

reported these issues to the Debtors' board of directors, the board terminated the members of the

founding group who were involved in the improper activities.  The current Chief Executive

Officer was then brought in to ensure appropriate controls were in place and to address the

Debtors' immediate operational and financial issues, as more fully set forth in the First Day

Declaration.

16.    The Stalking Horse Agreement provides for the sale of all Claims and

Retained Litigation (each as defined in the Asset Purchase Agreement),[5] which would include

claims held by the Debtors with respect the founding group's actions and may include claims for

fraud and breach of fiduciary duty.  The Debtors have not determined what, if any, Claims exist

as a result of the above-referenced conduct (or otherwise), have not ascertained the nature, extent

or scope of those Claims and have not conducted any analysis regarding the potential value of

such claims to their estates.

---

[5] Asset Purchase Agreement, §§ 1.1(n) and (r) and Article 12 (definition of "Claims" and "Retained Litigation").

17.     A description of the Acquired Assets that the Debtors propose to sell to the Stalking Horse Bidder, subject to higher and better bids, is summarized below:

18.     The Stalking Horse Bidder proposes to purchase the Acquired Assets set forth in section 1.1 of the Stalking Horse Agreement and summarized below:

(a)     all Accounts Receivable of Seller as of the Closing;

(b)     all Inventory of Seller as of the Closing, including pharmaceutical inventory, products and medical products and supplies, insulin, syringes, and schedule V items located at the Stores, and all rights of Seller to receive such Inventory that are on order as of the Closing;

(c)     except for the Store Closing Leases, all Leases for which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) any Leased Real Property that are designated as an Assumed Contract pursuant to Section 1.5 of the Stalking Horse Agreement, together with all security and other deposits related thereto, prepaid rent as of the Closing and appurtenances and other real property rights pertaining thereto and associated therewith;

(d)     each Contract designated as an Assumed Contract pursuant to section 1.5 of the Stalking Horse Agreement, including all rights and benefits accruing thereunder following the Closing;

(e)     all items of machinery, equipment, supplies, furniture, fixtures, Leasehold Improvements (to the extent of Seller's rights to any Leasehold Improvements under the Assumed Leases) and other tangible personal property and fixed assets owned by Seller or leased pursuant to any Contract as of the Closing (which, for the avoidance of doubt, does not include Inventory);

(f)     to the extent assignable or transferrable, each Employee Benefit Plan designated as an Assumed Contract pursuant to Section 1.5 of the Stalking Horse Agreement, and all assets of, and Contracts relating to or associated with, such Employee Benefit Plans;

(g)     to the extent assignable or transferrable, all insurance policies (but excluding, for the avoidance of doubt, any Excluded Insurance Policies) covering any of the Acquired Assets, and all benefits and rights to proceeds thereunder (including rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses associated with such insurance policies), in each case, only to the extent in respect of periods on or after the Closing Date, and all rights of every nature and description under or arising out of such policies with respect to periods on or after the Closing Date (including rights to refunds or

adjustments relating thereto and proceeds and recoveries therefrom, only to the extent in respect of periods on or after the Closing Date);

(h)     to the extent transferable under applicable Law, all Permits issued to Seller and all pending applications therefor as of the Closing, relating to the Acquired Assets, including those Permits set forth on Schedule 4.1(j) of the Stalking Horse Agreement;

(i)     all (i) Intellectual Property owned by Seller and (ii) to the extent transferable under applicable Law, Intellectual Property licensed to Seller, in each case, as of the Closing Date;

(j)     all sales orders or other commitments of Seller open as of the Closing to purchasers of goods, services or products produced or sold by the Business;

(k)     all purchase orders with suppliers open as of the Closing for delivery of goods under such purchase orders post-Closing;

(l)     all rights as of the Closing Date to (i) refunds relating to, and prepaid expenses and deposits attributable to, any Purchase Orders, Customer Orders, Assumed Contracts and Eligible Inventory, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of utilities provided to the Assumed Leased Real Property to the extent in respect of periods on or after the Closing Date, (iii) prepaid common area maintenance expenses relating to any Assumed Lease to the extent in respect of periods on or after the Closing Date and security deposits for any Assumed Lease, (iv) prepaid premiums in respect of the Assumed Benefit Plans and the Assumed Insurance Policies to the extent in respect of periods on or after the Closing Date, (v) ordinary holdbacks (including ordinary credit card holdback payments or protection reserves) in connection with or relating to any Acquired Asset, and (vi) other deposits, prepaid charges and expenses paid by Seller, including any prepaid freight charges, prepaid Taxes allocable to Post-Closing Taxes and other rights of Seller in connection with or relating to any Acquired Asset;

(m)     all goodwill and other intangible assets, including all goodwill associated with the Business and the Acquired Intellectual Property;

(n)     all Claims held by Seller as of the Closing, including with respect to the Retained Litigation, other than Avoidance Actions that are not Acquired Assets ("Excluded Claims"), and provided that Buyer will be obligated to share certain recoveries with respect to such Claims with Seller to the extent set forth in Section 2.1(f) of the Stalking Horse Agreement;

(o)     all other tangible or intangible assets of Seller as of the Closing primarily used in connection with the ownership, operation and/or management of the Business;

(p)     all Store-Level Cash;

(q)     all Avoidance Actions which directly relate to Persons with whom Buyer reasonably believes Buyer will continue to do business after the Closing;

(r)    to the extent permitted by applicable Law, all Documents as of the Closing that are primarily used in, held for use in or intended to be used in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities, Transferred Employees, or the Business, including all Documents related to products of Seller, services, marketing, advertising, promotional materials, Acquired Intellectual Property, Employee Records, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any Leased Real Property. Notwithstanding anything to the contrary in the Agreement, the Acquired Assets shall not include any information, documents or materials of any kind that are subject to third party privacy rights that preclude the transfer. Notwithstanding anything to the contrary in the Agreement but subject to Section 6.3(a) of the Stalking Horse Agreement, none of the Acquired Assets shall include any information, documents or materials of any kind that are (i) subject to attorney-client or attorney-client work product or similar privileges (including, for the avoidance of doubt, any of the foregoing that relate to the negotiation of the Agreement or the preparation for the filing of the Bankruptcy Case) (collectively, "Privileged Matter"), or (ii) subject to third party privacy rights that preclude the transfer. Buyer acknowledges and agrees that, subject to Section 6.3(a), (xx) any transfer, conveyance, disclosure, or delivery (including on any servers included in the Acquired Assets) of any Privileged Matter is entirely inadvertent and unintentional and shall neither be construed as, nor constitute, a waiver, modification, limitation, or impairment of the privileged or protected nature of such Privileged Matter, and (yy) any Privileged Matter inadvertently held by the Buyer shall, at the request of Seller, be transferred to Seller; and

(s)    All of Seller's prescription files and prescription records, data and patient refill history as of the Closing Date in respect of prescriptions filled by Seller at the Stores or otherwise utilized, maintained and/or generated by Seller in the course of operating its Business, including all hard copy prescriptions, patient profiles, signature logs, customer lists, and all electronic data of the foregoing maintained in any format by Seller, for at least two (2) years prior to the Closing Date or such longer period as may be required to comply with any applicable Governmental Authority record retention rules and regulations or shorter period to the extent any Store has been in operation for less than two (2) years. The Acquired Assets shall exclude all prescription files of patients who have opted to have their files transferred to a location other than one of the Stores.

## STALKING HORSE MARKETING PROCESS

19.    As discussed in the First Day Declaration, the Debtors faced severe liquidity and operational challenges in the summer and fall of 2022. During this time frame, the Debtors reached out to several parties, including certain of their competitors, to determine any interest in either a potential financial restructuring or sale of the Debtors' business. While several parties

executed nondisclosure agreements and performed certain diligence on the Debtors' business, no

offers were received.

20.     In late November 2022, the Debtors and the Stalking Horse Bidder began

negotiating the Stalking Horse Agreement.  In order to pursue the potential Sale, the Debtors

negotiated bridge financing from the Prepetition TPC Lenders[6] under the TPC Loan Agreement to

fund operations during the sale process in these chapter 11 cases, as set forth in the First Day

Declaration.

21.     On December 9, 2022, the Debtors entered into the Stalking Horse

Agreement with the Stalking Horse Bidder, who is affiliated with the DIP Lender and the

Prepetition TPC Lenders, but does not serve as a lender to the Debtors.  The Stalking Horse

Agreement seeks to sell the Acquired Assets to the Stalking Horse Bidder, subject to higher and

better bids, in consideration of payment to the Debtors of $18,500,000 as the Base Purchase Price

subject to adjustments as set forth in section 2.1(a) of the Stalking Horse Agreement.

22.     The Debtors intend to broadly market their assets postpetition with the goal

of fostering a robust bidding process and a competitive auction for the sale of the Acquired Assets

consistent with terms of the proposed Bidding Procedures.  The Debtors have and will continue to

pursue interest from direct competitors, the largest pharmacies in the country, and other investor

groups interested in early stage healthcare companies to solicit offers for the sale of the Acquired

Assets.  The Debtors will send (to the extent not already provided), notice of this Motion to all

---

[6] As explained in the First Day Declaration, the Debtors' obligations to TPC under the TPC Loan Agreement are
secured by liens on all of the Debtors' personal property assets and are junior to the liens under the SVB Loan
Agreement in favor of the Debtors' senior secured lender, SVB. The First Day Declaration also sets forth the
Debtors' prepetition capital structure and the estimated amounts owed by the Debtors to each of their secured
lenders.

parties that they believe may be potentially interested in acquiring the Acquired Assets, including

to the parties contacted prepetition.  The Debtors will assist interested parties who either have, or

will, execute confidentiality agreements acceptable to the Debtors to conduct diligence on the

Acquired Assets, in accordance with the Bidding Procedures.  The Debtors believe that the

marketing of the Acquired Assets over the period contemplated by the Bidding Procedures, in

addition to the marketing activities that have taken place to date, will result in the highest and best

purchase price for the Acquired Assets and maximize value for all of the Debtors' constituents.

23.     Given the Debtors' liquidity and operational constraints, the timing of the

Sale proposed herein is reasonable under the circumstances in order to effectuate the sale of the

Acquired Assets.  Thus, the Debtors believe that the Bidding Procedures proposed hereby will

enable the efficient consummation of the sale of the Acquired Assets at an auction to the highest

or best bidder.

## THE PROPOSED BIDDING PROCEDURES AND THE
## ACQUIRED ASSETS TO BE SOLD PURSUANT TO THE SALE

### A.     Summary of Proposed Bidding Procedures

24.     The Bidding Procedures are designed to promote a competitive and

expedient sale process to consummate the Sale.  If approved, the Bidding Procedures will allow

the Debtors to solicit and identify bids from potential buyers that constitute the highest or best

offer for the sale of the Acquired Assets on a schedule consistent with the Milestones.

25.     As the Bidding Procedures are attached to the Bidding Procedures Order,

they are not herein restated in their entirety.  Pursuant to Local Rule 6004-1(c), certain of the key

terms of the Bidding Procedures are highlighted in the chart below:

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders**<br>Local Rule 6004-1(c)(i)(A) | To receive due diligence information and to receive additional nonpublic information regarding the Debtors, a potential bidder must deliver to the Debtors' Advisors, the following documents (collectively, the "<u>Preliminary Bid Documents</u>") on or prior to January 8, 2023, at 4:00 p.m. (prevailing Eastern Time) unless otherwise waived by the Debtors in their discretion:<br><br>a. an executed Confidentiality Agreement on terms acceptable to the Debtors, to the extent not already executed, which Confidentiality Agreement shall, among other terms, contain customary provisions regarding: (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a Transaction, (iii) covenant to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the Confidentiality Agreement;<br><br>b. evidence by the potential bidder of its sufficient financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the potential bidder (or, if the potential bidder is an entity formed for the purpose of acquiring the Acquired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors, with the assistance of the Debtors' Advisors;<br><br>c. written disclosure of any connections or agreements with the Debtors, the Stalking Horse Bidder, any other known potential bidder or Qualified Bidder (defined below), "insiders" of the Debtors (as that term is contemplated by section 101(31) of the Bankruptcy Code), and/or any manager or direct or indirect equity security holder of the Debtors; and<br><br>d. identification of the potential bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction. |

| | |
|---|---|
| **Provisions Governing Qualification of Bidders** Local Rule 6004-1(c)(i)(B) | Each Bid submitted by an Acceptable Bidder (a "<u>Bidder</u>") must be submitted in writing and satisfy the following requirements (collectively, the "<u>Bid Requirements</u>," unless otherwise modified by the Debtors (except for the requirement set forth in II(d) below), in their discretion, upon consultation with the Consultation Parties (defined below):<br><br>a. <u>Bid Deadline</u>. A Bid must be received no later than the Bid Deadline.<br><br>b. <u>Marked Agreement</u>. A Bid must include an executed asset purchase agreement (a "<u>Competing APA</u>"), together with all exhibits and schedules (the "<u>Transaction Documents</u>"), pursuant to which the Acceptable Bidder proposes to effectuate the contemplated transaction, which Competing APA must be similar in form and substance to the Stalking Horse Agreement and be marked to reflect the differences between the Stalking Horse Agreement and the Bidder's Competing APA, including, without limitation, specification of the proposed purchase price, any assumed liabilities, and any changes to any exhibits or schedules to the Competing APA. A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Transaction Documents. The Transaction Documents must include a commitment to close by no later than the closing date provided in the Stalking Horse Agreement. A Bid should propose a contemplated transaction involving all or substantially all of the Assets; *provided, however*, that the Debtors in their discretion (following consultation with the Consultation Parties), may consider proposals for less than substantially all the Assets so long as the economic value of such a proposal provides an economic value to the Debtors' estates that is greater than the Stalking Horse Bid, *provided further* that the Debtors will evaluate all Bids, in their sole discretion (following consultation with the Consultation Parties), to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole in light of any factors regarding such bid which the Debtors, in their discretion, determine are appropriate to be considered in evaluating Bids.<br><br>c. <u>Purpose</u>. Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Assets and state which Assets with reasonable specificity. Each Acceptable Bid must clearly identify the following: (i) contracts to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; (ii) the liabilities, if any, to be assumed; (iii) leases of equipment or stores to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; and (iv) which employees or groups thereof will be offered employment.<br><br>d. <u>Purchase Price</u>. The consideration proposed by a Bid may include cash and/or other consideration acceptable to the Debtors in an amount of no less than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreement) <u>plus</u> (ii) the Break-Up Fee and Expense Reimbursement (as defined in the Stalking Horse Agreement) <u>plus</u> (iii) $250,000. Each Bid must clearly set forth the terms of any proposed |

Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, including, for example, any liabilities to be assumed by the Acceptable Bidder.

e.  <u>Deposit</u>.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration (with the deposit amount for the non-cash consideration determined by the Debtors in their discretion) of the Bid to be held in an escrow account to be identified and established by the Debtors (the "<u>Deposit</u>"); *provided that* that the Debtors reserve the right (i) to modify the amount of the Deposit in their discretion in an amount of not less than 5% of the aggregate value of the cash and non-cash consideration and (ii) to request an additional Deposit in the event an Acceptable Bidder increases the amount of its Bid.

f.  <u>Irrevocable</u>.  All Bids must be irrevocable until the Debtors' selection of the Successful Bid and Backup Bid; *provided however*, that the Bids selected as either the Successful Bid or the Backup Bid (defined below) must be irrevocable and remain open for acceptance by the Debtors until three (3) Business Days after the closing of the Transaction with the Successful Bidder or the Backup Bidder, as applicable, subject to the rights of the of the Stalking Horse Bidder to terminate the Stalking Horse Agreement in accordance with the terms thereof.

g.  <u>Committed Financing</u>.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, after consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's purchase price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors and reasonably acceptable to each of the Consultation Parties.

h.  <u>Unconditional Offer / Contingencies</u>.  A statement that the Bid is formal, binding, and unconditional and is not subject to any further due diligence or financing contingency, and is irrevocable until the Debtors notify the Bidder that such Bid is not a Successful Bid or a Backup Bid.

i.  <u>Non-Reliance</u>.  A Bid must include a written acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and Assumed Liabilities (as defined in the Stalking Horse Agreement) prior to making its Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in

connection therewith or the Auction.

j.  Identity.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' Advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent (following consultation with the Consultation Parties) to such submission and the disclosure requirements set forth herein.

k.  Adequate Assurance.  Each Bid must contain evidence acceptable to the Debtors in their discretion (following consultation with the Consultation Parties) that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) and 365(b)(3) of the Bankruptcy Code.  Such evidence may include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request.

l.  Authorization.  Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the closing of the Transaction contemplated in such Bid.

m.  No Fees Payable to Qualified Bidder.  Except with respect to the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Bidder in accordance with the Stalking Horse Agreement, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue any break-up fee, termination fee, expense reimbursement or similar type of payment, or substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bidding Procedures.

| | |
|---|---|
| **Provisions Providing Bid Protections to Stalking Horse Bidder** Local Rule 6004- 1(c)(i)(C) | To provide the Stalking Horse Bidder with an incentive to participate in a competitive process and to compensate the Stalking Horse Bidder for (i) performing substantial due diligence and incurring the expenses related thereto and (ii) entering into the Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed, and the Court has approved in the Bidding Procedures Order, that the Stalking Horse Bidder is entitled, under certain conditions set forth in the Stalking Horse Agreement and pursuant to the terms thereof, to: (A) the Break-Up Fee of $450,000 and (B) the Expense Reimbursement subject to a cap of $500,000.  As set forth below, payment of the Break-Up Fee and Expense Reimbursement (to the extent payable under the Stalking Horse Agreement and Bidding Procedures Order) shall be a component of any Qualified Bid submitted by a Qualified Bidder (other than the Stalking Horse Bidder).  The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Bidding Procedures Order and the Stalking Horse Agreement. |
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | The Debtors reserve their rights to modify these Bidding Procedures, upon consultation with the Consultation Parties, in their business judgment in any manner that will best promote the goals of these Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Transaction, including, without limitation:  (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids (other than the Stalking Horse Bid in existence as of the Effective Date);

Nothing in these Bidding Procedures or the Bidding Procedures Order modifies the rights of, or authorizes the Debtors to modify the rights of, the Stalking Horse Bidder under the Stalking Horse Agreement. |

| | |
|---|---|
| **Closing with Alternative Backup Bidders**<br>Local Rule 6004-1(c)(i)(E) | Notwithstanding anything in these Bidding Procedures to the contrary, if the Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the conclusion of the Auction for the Assets or any sub-group thereof, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") with respect to the Assets until such time that the Transaction is consummated. Each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors, but subject to the rights of the Stalking Horse Bidder, if any, to terminate the Stalking Horse Agreement on the terms therein. Notwithstanding anything herein to the contrary, the Stalking Horse Bidder shall have no obligation to be the Backup Bidder and shall retain all rights to terminate the Stalking Horse Agreement on the terms therein.<br><br>The identity of a Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder related thereto.  Such Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the Approved Transaction (defined below).  Each Backup Bidder's Deposit shall be held in escrow (which may be held in escrow by Pachulski Stang Ziehl & Jones LLP) until three (3) Business Days after the closing of the Approved Transaction.<br><br>If a Successful Bidder fails to consummate the Approved Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder with respect to the Assets or sub-group of the Debtors' Assets or business as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party, and subject to the rights of the Stalking Horse Bidder, if any, to terminate the Stalking Horse Agreement in accordance with the terms therein.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.  Notwithstanding anything herein to the contrary, the Deposit of the Stalking Horse Bidder shall be treated in accordance with the Stalking Horse Agreement. |

| | |
|---|---|
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Stalking Horse Bidder shall be deemed the Successful Bidder; *provided however*, the Debtors may, in their discretion, open the Auction solely for the purpose of reflecting on the record that no other Qualified Bids were received other than the Stalking Horse Bid.

If the Debtors receive more than one Qualified Bid for the Assets (other than the Stalking Horse Bid), the Debtors will conduct the Auction to determine both the Successful Bidder and the Backup Bidder with respect to such Assets. The Auction shall take place on January 17, 2023 at 10:00 a.m. (prevailing Eastern Time), at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE. 19801 (or by video conference to the live proceeding at this location), or such later date and time as selected by the Debtors (following consultation with the Consultation Parties).

No later than the day before the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, or, if multiple bids are received in respect of non-overlapping Assets, the highest or best Qualified Bid(s) received in relation to each group of Assets, in each case as determined in the Debtors' business judgment (each such bid, a "<u>Baseline Bid</u>"), and provide copies of the documents supporting the Baseline Bid(s) to all Qualified Bidders and the Consultation Parties. The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation of the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed (collectively, the "<u>Bid Assessment Criteria</u>").

The Auction shall be conducted pursuant to the following procedures:

<u>The Debtors Shall Conduct the Auction</u>

The Debtors and the Debtors' Professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid(s). All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders and the Consultation Parties. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, the Successful Bid(s), and any Backup Bid(s).

Only (i) Qualified Bidders, (ii) the Consultation Parties, and (iii) the members of the Committee, and each of their respective legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (live or on videoconference) and may speak or bid themselves |

or through duly authorized representatives.  Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

Terms of Overbids

"Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid.  Each Overbid must comply with the following conditions:

Minimum Overbid Increment

Any Overbid to the initial Baseline Bid at the start of the Auction shall be in increments of no less than a value equal to $250,000, unless otherwise determined by the Debtors in an exercise of their business judgment.

Conclusion of Each Overbid Round

Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, and upon consultation with the Consultation Parties, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

Overbid Alterations

An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

No Round-Skipping

Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, following consultation with the Consultation Parties, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets.

Announcing Highest Bid

With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors in consultation with the Consultation Parties have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

<u>Consideration of Overbids</u>

The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times upon consultation with the Consultation Parties, to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount.

<u>Closing the Auction</u>

The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their discretion following consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the Assets.  Such Qualified Bid shall be declared the "<u>Successful Bid</u>," and such Qualified Bidder, the "<u>Successful Bidder</u>," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of such Successful Bid is conditioned upon approval by the Court of such Successful Bid, and subject to the rights of the Stalking Horse Bidder, if any, to terminate the Stalking Horse Agreement in accordance with the terms thereof.  For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law.  As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Court.

## B.   Description of the Assets to Be Sold Pursuant to the Sale[7]

26.   The pertinent terms of the Stalking Horse Agreement including the provisions required by Local Rule 6004-1(b), are summarized below.  The description below only summarizes certain provisions of the Stalking Horse Agreement.  The terms of the Stalking Horse Agreement control in the event of any inconsistency.

| **Sale to Insider** Local Rule 6004-1(b)(iv)(A) | The Stalking Horse Bidder is not an insider of the Debtors.  The Stalking Horse Bidder is affiliated with the Prepetition TPC Lenders and the DIP Lender. <br><br> Bidding Procedures Order, ¶ 17 |
| --- | --- |

---

[7] Unless otherwise noted, capitalized terms used in this section of the Motion have the meanings ascribed in the Stalking Horse Agreement.

| | |
|---|---|
| **Agreements with Management**<br>Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Agreement does not provide for any agreements with management.  The Stalking Horse Agreement provides that as of the Closing Date, Stalking Horse Bidder shall have the right to offer employment to any and all employees of Seller on terms and conditions of employment, including salaries and benefits, as Stalking Horse Bidder should determine in its sole and absolute discretion.<br><br>Stalking Horse Agreement, § 7.1 |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | The Stalking Horse Agreement does not provide for any releases or the waiver or satisfaction of claims. |
| **Private Sale/No Competitive Bidding**<br>Local Rule 6004-1(b)(iv)( D) | The Bidding Procedures Order provides for a potential auction if the Debtors receive at least another Qualified Bid (in addition to the Stalking Horse Agreement).<br><br>Section 6.1(a) of the Stalking Horse Agreements provides that until the time bids are due in accordance with the Bid Procedures Order or, if a competing bid is submitted, until the conclusion of the Auction, Seller is permitted to and to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by any Person (in addition to Stalking Horse Bidder and its Affiliates and representatives) in connection with any Alternative Transaction; provided, however, that until the date the Bankruptcy Court enters the Bid Procedures Order, Seller agrees that (a) it will not, and it will cause its agents, representatives, professionals, advisors, attorneys, employees, directors, officers, stockholders, and Affiliates to not, directly or indirectly, solicit or entertain offers from, negotiate with, or in any manner encourage, discuss, accept, or consider any proposal, agreements, or arrangements with any person or entity other than Buyers with respect to a possible sale, divestiture, or otherwise of any of the Acquired Assets of Seller that could or would serve as a "stalking horse," compete with the transactions contemplated by the Agreement as the "stalking horse," potentially or actually replace the Stalking Horse Bidder as the "stalking horse" for some or all of the Acquired Assets, or otherwise interfere with the transactions contemplated by this Agreement until the date the Bankruptcy Court enters the Bid Procedures Order and (b) a breach of this provision shall be deemed a material breach of a covenant giving Stalking Horse Bidder the right to terminate the Agreement (without any right to cure), and the Deposit shall be returned to the Stalking Horse Bidder as the sole and exclusive recourse in the event the Agreement is terminated pursuant to this provision; provided, further, that nothing shall prevent Seller from (a) entering into any confidentiality agreement or (b) providing access to information to any party that has entered into a confidentiality agreement.  In addition, Seller shall have the authority to respond to any inquiries or offers with respect to an Alternative Transaction and perform any and all other acts related thereto to the extent any such act is not in violation of the Bid Procedures Order, the Bankruptcy Code or the Agreement.<br><br>Stalking Horse Agreement, § 6.1(a) |

| | |
|---|---|
| **Closing**<br>Local Rule 6004-1(b)(iv)(E) | Subject to the terms and conditions set forth in the Stalking Horse Agreement, the consummation of the transactions contemplated by the Stalking Horse Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 11:00 a.m., Eastern Time, on the first (1st) Business Day following the satisfaction or, to the extent permitted by the Agreement, waiver of each of the conditions set forth in Article 9 of the Stalking Horse Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by the Stalking Horse Agreement, of such conditions), or such other date as may be agreed to by Seller and Stalking Horse Bidder, which date shall not be earlier than the first (1st) Business Day following the entry of the Sale Order by the Bankruptcy Court.<br><br>Stalking Horse Agreement, § 3.1 |
| **Deposit**<br>Local Rule 6004-1(b)(iv)(F) | The Stalking Horse Bidder shall deliver to the Deposit Escrow Agent in immediately available good funds of the United States of America a good faith deposit in amount equal to One Million Dollars ($1,000,000) (the "Deposit"). When received by Seller, the Deposit shall be credited and applied toward payment of the Purchase Price at the Closing or returned to Stalking Horse Bidder or delivered to Seller, as applicable, in accordance with Section 10.2 of the Stalking Horse Agreement (Effect of Termination; Remedies)<br><br>Stalking Horse Agreement §§ 2.1(b) and 10.2 |
| **Interim Arrangements with Proposed Purchaser**<br>Local Rule 6004-1(b)(iv)(G) | The Stalking Horse Bidder and Seller shall enter into an agreement in form and content reasonably satisfactory to the Stalking Horse Bidder and Seller with respect to the provision of certain transition services by Seller to the Stalking Horse Bidder prior to the Bankruptcy Court hearing on Bid Procedures.<br><br>Stalking Horse Agreement § 3.1<br><br>The Stalking Horse Agreement also provides for the Stalking Horse Bidder to provide certain transitional services, including (i) reasonable access to the Stalking Horse Bidder's personnel, information technology systems and books and records and (ii) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process.<br><br>Stalking Horse Agreement § 6.2(a) |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | The Stalking Horse Agreement does not propose to release sale proceeds on or after the closing without further Court order or to provide for a definitive allocation of sale proceeds between or among various sellers of collateral.<br><br>The Stalking Horse Agreement does provide that no later than sixty (60) days after the expiration of the Retained Contracts Period, the Stalking Horse Bidder shall deliver a schedule to Seller allocating the Purchase Price among the Acquired Assets.<br><br>Stalking Horse Agreement § 8.3 |

| | |
|---|---|
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | The Sale Motion and the Stalking Horse Agreement do not seek to have any taxes declared exempt under section 1146(a) of the Bankruptcy Code. |
| **Record Retention** Local Rule 6004-1(b)(iv)(J) | The Stalking Horse Agreement includes as Excluded Assets, any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that, following the Closing, and to the extent permitted by applicable Law, Seller shall make such Documents, to the extent relating to the Acquired Assets or the Assumed Liabilities, available to Stalking Horse Bidder upon Stalking Horse Bidder's reasonable request. Stalking Horse Agreement, §1.2(d) Upon reasonable request from Seller during reasonable hours and taking into consideration the workload of Stalking Horse Bidder's employees on behalf of Stalking Horse Bidder, Stalking Horse Bidder will, for a period commencing on the Closing Date and ending upon the closing or other termination of the Bankruptcy Case, provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator or liquidator of Seller's estate, such access to the pre-Closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and to conclude the Bankruptcy Case, including the reconciliation and litigation of claims and making of distributions to creditors or otherwise. Stalking Horse Agreement, § 6.2(a) |
| **Sale of Avoidance Actions** Local Rule 6004-1(b)(iv)(K) | The Stalking Horse Agreement includes in the definition of Acquired Assets, Avoidance Actions which directly relate to Persons with whom Stalking Horse Bidder reasonably believes Stalking Horse Bidder will continue to do business after the Closing. Stalking Horse Agreement, § 1.1(q) |

| Requested Findings as to Successor Liability Local Rule 6004-1(b)(iv)(L) | The Parties intend that upon the Closing, the Stalking Horse Bidder shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Law; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in the Agreement, including successor or vicarious liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity (including under securities laws of any Governmental Authority); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of Seller (and there is no continuity of enterprise between the Stalking Horse Bidder and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate.<br><br>Stalking Horse Agreement, § 11.17 |
|---|---|
| Sale Free and Clear of Unexpired Leases Local Rule 6004-1(b)(iv)(M) | At the Closing, upon and subject to the terms and conditions set forth in the Agreement, Seller shall sell to the Stalking Horse Bidder, and Stalking Horse Bidder shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens (other than Permitted Liens) to the extent set forth herein and as provided in the Sale Order and shall assume the Assumed Liabilities.<br><br>Stalking Horse Agreement, § 1.1<br><br>The Stalking Horse Agreement defines "Lien" as any lien (statutory or otherwise), Claim, Encumbrance, Interest, Liability, deed of trust, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, mortgage, pledge, lien, charge, security interest, easement, security agreement or other encumbrance or restriction on the use or transfer of any property, hypothecation, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing and (ii) any assignment or deposit arrangement in the nature of a security device,), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.<br><br>Stalking Horse Agreement, § 12.1<br><br>In addition, the proposed Sale Order will contain customary provisions regarding the sale of the Acquired Assets free and clear of liens, claims, interests and encumbrances and similar provisions regarding no successor liability. |

| | |
|---|---|
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The DIP Lender and the Prepetition TPC Lenders (as defined in the DIP Order) are affiliated with the Stalking Horse Bid. Notwithstanding anything to the contrary provided herein or in the Bidding Procedures, each of the Prepetition TPC Lenders and the DIP Lender, subject to section 363(k) of the Bankruptcy Code, may credit bid of all or any portion of the aggregate amount of their respective secured claims (including, without limitation, either or both of their prepetition or postpetition secured claims) pursuant to section 363(k) of the Bankruptcy Code at any time during the Auction; *provided, however,* that other than in support of any Overbid, any credit bid submitted by the Prepetition TPC Lenders and the DIP Lender shall only be used to enhance the value the Stalking Horse Bid, and such credit bid, unless in support of any Overbid, shall not be made by the Prepetition TPC Lenders and the DIP Lender on behalf of any other bids for their own benefit or the bid of any other party other than the Stalking Horse Bidder; *provided further* that any improved Stalking Horse Bid pursuant to any such credit bid must continue to comply in all respects with the requirements for Qualified Bids as set forth in the Bidding Procedures. Notwithstanding anything herein to the contrary, the DIP Lender and/or Prepetition TPC Lenders (or any affiliates thereof) may not exercise their credit bid rights, whether under section 363(k) of the Bankruptcy Code or otherwise, without having received the prior written consent of the Prepetition Senior Lender (such consent to not be unreasonably withheld, conditioned, or delayed). Bidding Procedures Order, ¶ 17 |
| **Relief From Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | Any proposed Sale Order may provide, that notwithstanding Bankruptcy Rules 6004 and 6006, the Sale Order shall be effective and enforceable immediately upon entry. |
| **Assumed Liabilities** | The Stalking Horse Agreement provides for the assumption by the Stalking Horse Bidder of certain Assumed Liabilities Stalking Horse Agreement, § 1.3 |
| **Termination of Stalking Horse Agreement** | Article 10 of the Stalking Horse Agreement provides the events and conditions under which the Stalking Horse Agreement may be terminated. Stalking Horse Agreement, § 10.1 |
| **Conditions to Parties' Performance Obligations** | Article 9 of the Stalking Horse Agreement sets forth the conditions precedent of each of the parties to the Stalking Horse Agreement Stalking Horse Agreement, § § 9.1, 9.2 and 9/3 |

27.     The Debtors have determined that, in light of their financial situation,

liquidity needs, a more viable alternative to sale of the Acquired Assets does not exist. The

Debtors believe that the Sale of the Acquired Assets pursuant to this Motion optimizes value for their economic stakeholders.

### C.    Sale Noticing and Objection Procedures

28.    The "Sale Process Key Dates and Deadlines" chart set forth above summarizes the proposed noticing and objection procedures and requirements with respect to service of the Sale Notice, the Sale Objection Deadline, and the deadline to publish to the Sale Notice (collectively, the "Sale Noticing and Objection Procedures").  The Debtors submit that the Sale Noticing and Objection Procedures constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the sale process, including the Sale Objection Deadline and the Sale Hearing.  The Sale Notice also provides parties with information on how to obtain copies of the Motion, sets forth the Bid Deadline and the time and place of the Auction.  No later than three (3) Business Days after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice on the following parties: (i) counsel to any statutory committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"); (ii) the U.S. Trustee; (iii) counsel to Silicon Valley Bank; (iv) counsel to the Prepetition TPC Lenders and the DIP Lenders; (v) counsel to the Stalking Horse Bidder; (vi) all known creditors of the Debtors (for whom identifying information and addresses are available to the Debtors); (vii) the Internal Revenue Service; (viii) all applicable federal, state, and local taxing authorities; (ix) all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Acquired Assets during the past 6 months; (x) all persons and entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in the

Acquired Assets (for whom identifying information and addresses are available to the Debtors); (xi) Counterparties to Potential Assumed Contracts; (xii) any governmental authority known to have a claim against the Debtors in the Chapter 11 Cases; (xiii) the United States Securities and Exchange Commission; (xiv) the United States Attorney's Office for the District of Delaware; (xv) United States Attorney General's Office for the District of Delaware; (xvi) the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate; (xvii) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (xviii) all other parties as directed by the Court.

29.     The Debtors also propose that any objections to the Sale must be in writing, state, with specificity, the legal and factual bases thereof, be filed with the Court by the Sale Objection Deadline and be served on the following parties: (1) proposed counsel for the Debtors;  (2) counsel to any Committee; (3) the United States Trustee;(4) counsel to Silicon Valley Bank:  (5) counsel to the Prepetition TPC Lenders and the DIP Lender:  (6) counsel to the Stalking Horse Bidder; and (7) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

30.     The Sale Notice also provides information on how to obtain copies of the Motion and other sale related information directly from the case website maintained by the Debtors' claims agent (the "Case Management Website").  Accordingly, the Debtors request that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

D.      **Potential Assumption and Assignment Notice and Proposed Assumption and Assignment Procedures for Contracts**

31.     At the closing of the Sale, the Debtors may seek to assume and assign to the Successful Bidder all or certain of the Potential Assumed Contracts.[8]  For any Potential Assumed Contract that is listed in the Contracts Schedule (defined below), the Successful Bidder may decide to (i) assume and assign the Potential Assumed Contract, (ii) request that the Debtors reject the Potential Assumed Contract, or (iii) designate a "retained contract" the Potential Assumed Contract for a limited period of time until the Successful Bidder determines whether such Potential Assumed Contract should be (a) assumed and assigned or (b) rejected.

32.     The Debtors will serve the Potential Assumption and Assignment Notice substantially in the form attached to the Bidding Procedures Order as Exhibit 3 on all Counterparties to Potential Assumed Contracts.  The Assumption Assignment Notice provides notice of, *inter alia*, the possible assumption and assignment of the Potential Assumed Contracts, the Debtors' proposed Cure Amounts, the applicable deadlines to object to the assumption and assignment of the Potential Assumed Contracts with respect to disputed Cure Amounts and/or on the basis of adequate assurance of future performance. The Potential Assumption and Assignment Notice also provides information on how to access the Bidding Procedures and Bidding Procedures Order from the Case Management Website.  Accordingly, the Debtors request that the Court approve the form of Potential Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3, and find that the

---

[8] The inclusion of any agreement in the list of Potential Assumed Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included in the list of Potential Assumed Contracts.

Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 6006 and Local Rule 2002-1.

33.     The Successful Bidder, shall be responsible for payment of any Cure Amounts that may be owed to any counterparty to the Potential Assumed Contracts.  The Successful Bidder shall also be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b)(1) of the Bankruptcy Code in connection with the proposed assignment of any Potential Assumed Contracts.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Potential Assumed Contracts pursuant to section 365(b)(1) of the Bankruptcy Code at the Sale Hearing, or as such other hearing as may be scheduled by the Court.

34.     The Debtors request that the Court approve the proposed Assumption and Assignment Procedures, including with respect objections by any Counterparty to:  the proposed assumption or assignment of its Potential Assumed Contract, the Debtors' proposed Cure Amounts with respect to such Potential Assumed Contract, if any, or the ability of the Stalking Horse Bidder or any other potential bidder to provide adequate assurance of future performance (collectively, an "Assumption and Assignment Objection").  The Debtors propose that all Assumption and Assignment Objections must be in writing, comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365(b)(1) of the Bankruptcy Code) under the relevant

Potential Assumed Contract, and be filed by the Assumption and Assignment Objection
Deadline.

35.     If a Counterparty files a timely Assumption and Assignment Objection,
the Debtors propose that the Court hear and determine such objection either at the Sale Hearing
or such other date that the Debtors and the Successful Bidder shall determine (subject to the
Court's calendar).   If a Counterparty fails to file with the Court and serve a timely Assumption
and Assignment Objection, the Counterparty shall be barred from asserting any such objection
with regard to the assumption or assignment of its Potential Assumed Contract. In such event,
notwithstanding anything to the contrary in the Potential Assumed Contract, or any other
document, the Debtors request that the Cure Amounts set forth in the Potential Assumption and
Assignment Notice be controlling and shall be the only amount necessary to cure outstanding
defaults under the applicable Potential Assumed Contract under section 365(b)(1) of the
Bankruptcy Code arising out of or related to the Potential Assumed Contract following the
assumption and assignment of the Potential Assumed Contract.  Moreover, if a Counterparty
fails to file with the Court and serve a timely Assumption and Assignment Objection, the
Debtors request that the Counterparty be forever barred from asserting any cure or other pre-
assignment amounts in excess of the Cure Amount set forth in the applicable Potential
Assumption and Assignment Notice with respect to such Potential Assumed Contract against the
Debtors, the Successful Bidder or the property of any of them.

36.     The Debtors may, pursuant to the agreement with the Stalking Horse
Bidder or other Successful Bidder, add supplemental Potential Assumed Contracts to the

schedule of Potential Assumed Contracts (the "Contracts Schedule") or modify previously-noticed Cure Amounts in accordance with the Stalking Horse Agreement or agreement with such other Successful Bidder.  In such an event, the Debtors will promptly serve a supplemental assumption and assignment notice, by overnight mail and, if known, e-mail, on the applicable Counterparties (collectively, a "Supplemental Assumption and Assignment Notice"). Each Supplemental Assumption and Assignment Notice will include the same information with respect to the applicable Potential Assumed Contract as is required to be included in the Potential Assumption and Assignment Notice.

37.    The Debtors propose that any Counterparty listed on a Supplemental Assumption and Assignment Notice whose Potential Assumed Contract is proposed to be assumed and assigned and was not included in the Potential Assumption and Assignment Notice may object to the proposed assumption or assignment of its Potential Assumed Contract, the Debtors' proposed Cure Amounts with respect to its Potential Assumed Contract, if any, or the ability of the Successful Bidder to provide adequate assurance of future performance (collectively, a "Supplemental Assumption and Assignment Objection"). The Debtors request that all Supplemental Assumption and Assignment Objections must state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amounts the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the relevant Potential Assumed Contract and be filed by no later than ten (10) calendar days after the date of service of such Supplemental Assumption and Assignment Notice.  If a Potential Assumed Contract was listed in the Potential Assumption and

Assignment Notice and the previously-stated Cure Amount is modified in the Supplemental

Assumption and Assignment Notice, the Counterparties to such Potential Assumed Contract may

file a Supplemental Assumption and Assignment Objection only if such objection is to the

modified Cure Amount.

38.     If a Counterparty fails to file with the Court and serve a timely Supplemental

Assumption and Assignment Objection, the Counterparty shall be barred from asserting any such

objection with regard to the assumption or assignment of its Potential Assumed Contract. In such

event, notwithstanding anything to the contrary in the Potential Assumed Contract, or any other

document, the Debtors request that the Cure Amounts set forth in the Supplemental Assumption

and Assignment Notice be controlling and shall be the only amount necessary to cure outstanding

defaults under the applicable Potential Assumed Contract under section 365(b)(1) of the

Bankruptcy Code arising out of or related to the Potential Assumed Contract following the

assumption and assignment of the Potential Assumed Contract.  Moreover, if a Counterparty fails

to file with the Court and serve a timely Supplemental Assumption and Assignment Objection, the

Debtors request that the Counterparty be forever barred from asserting any cure or other pre-

assignment amounts in excess of the Cure Amount set forth in the applicable Supplemental

Assumption and Assignment Notice with respect to such Potential Assumed Contract against the

Debtors, the Successful Bidder or the property of any of them.

39.     The Successful Bidder will be responsible for providing evidence of

"adequate assurances of future performance" to the extent required in connection with the

assumption and assignment of any Potential Assumed Contract.

40.    Finally, the Debtors request that, following any Auction, if the Stalking

Horse Bidder is not the Successful Bidder, each Counterparty may raise any objections to such

Successful Bidder's ability to provide adequate assurances of future performance under section

365(b)(1) at the Sale Hearing provided that any objections relating to (i) the ability of the

Stalking Horse Bidder to provide adequate assurance of future performance with respect to any

Potential Assumed Contract or (ii) the Cure Amounts that must be cured by either the Stalking

Horse Bidder or any Successful Bidder that is not the Stalking Horse Bidder with respect to the

Potential Assumed Contract, must be filed by Assumption and Assignment Objection Deadline

as provided above.

41.    The Debtors submit that the proposed procedures governing the

assumption and assignment of Potential Assumed Contracts are reasonable and should be

approved.

## **ARGUMENT**

A.    **The Bidding Procedures Are Fair, Appropriate and in the Best Interests of the Debtors and Their Stakeholders**

42.    The Bidding Procedures are specifically designed to promote what courts

have deemed to be the paramount goal of any proposed sale of a debtor's property—maximizing

the value of sale proceeds received by the estate.  *See Burtch et al. v. Ganz, et al. (In re Mushroom*

*Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and

maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v.*

*Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (debtor has "fiduciary duty to maximize the value of

the bankruptcy estate"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a

primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing

*Metro. Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494

(7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization

of the value of the bankruptcy estate for the benefit of creditors.")).  Courts uniformly recognize

that procedures established for the purpose of enhancing competitive bidding are consistent with

the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien*

*Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting

that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate);

I*n re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed

rules for the disposition of assets . . .  [should] provide an adequate basis for comparison of offers,

and [should] provide for fair and efficient resolution of bankrupt estates.").

43.     The Bidding Procedures provide for an orderly, uniform and appropriately

competitive process through which interested parties may submit offers in connection with the

Sale of the Acquired Assets.  The Debtors, with the assistance of their advisors, have structured

the Bidding Procedures to promote active bidding by interested parties and to confirm the highest

or otherwise best offer reasonably available for the Acquired Assets.  The Bidding Procedures

will allow the Debtors to conduct any Auction in a fair and transparent manner that will

encourage participation by financially capable bidders with demonstrated ability to consummate

a timely sale or sales.

44.     Courts in this District and other districts routinely approve procedures

substantially similar to the proposed Bidding Procedures, including procedures providing for the

designation of stalking horse bidders and sale timelines. *See*, *e.g.*, *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) [Docket No. 151] (Bankr. D. Del. Apr. 24, 2019) (authorizing designation of stalking horse bidders and provision of bid protections without further hearing with consent of United States Trustee and consultation parties)**;** *In re Hobbico, Inc.*, No. 18-10055 (KG) [Docket No. 243] (Bankr. D. Del. Mar. 14, 2018) (same); *In re California Proton Treatment Center, LLC*, No. 1710477 (LSS) [Docket No. 158] (Bankr. D. Del. Apr. 12, 2017) (same); *In re United Road Towing, Inc.*, No. 17-10249 (LSS) [Docket No. 131] (Bankr. D. Del. Mar. 6, 2017) (same); *In re Constellation Enterprises LLC*, No. 16-11213 (CSS) [Docket No. 260] (Bankr. D. Del. Jun. 15, 2016) (same); *See also, e.g., In re Mabvax Therapeutics Holdings, Inc.*, No. 19-10603 (CSS) [Docket No. 78] (Bankr. D. Del. Apr. 8, 2019) (approving bidding procedures with a bid deadline 18 days after entry of bidding procedures order); *In re Things Remembered, Inc.*, No. 19-10248 (CSS) [Docket No. 100] (Bankr. D. Del. Mar. 13, 2019) (approving bidding procedures with bid deadline 7 days after entry of order and auction scheduled for 26 days after entry of order); *In re Charlotte Russe Holding, Inc.*, No. 19-10210 (LSS) [Docket No. 199] (Bankr. D. Del. Feb. 21, 2019) (approving bidding procedures with bid deadline 10 days after entry of order and auction scheduled for 29 days after entry of order); *In re Maurice Sporting Goods, Inc*., No. 17-12481 (CSS) [Docket No. 125] (Bankr. D. Del. Dec. 12, 2017) (entering bidding procedures order 22 days after petition date, approving bid deadline 10 days after entry of order); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) [Docket No. 196] (Bankr. D. Del. Oct. 6, 2016) (approving bidding procedures with a bid deadline 11 days after entry of order and auction scheduled for 13 days after entry of order).

45.     Accordingly, the Bidding Procedures should be approved, not just because they are aligned with the circumstances of the Debtors' chapter 11 cases, but also because they are consistent with procedures approved by courts in this District in cases of similarly-situated debtors and are otherwise reasonable, appropriate, and in the best interests of the Debtors, their estates and all parties in interest.

**B.     The Proposed Bid Protections Are Necessary, Reasonable and Appropriate**

46.     As indicated above, the Debtors hereby request that the Court approve the Break-Up Fee and Expense Reimbursement.  The Debtors and Stalking Horse Bidder believe that the amount of the Break-Up Fee is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive Stalking Horse Agreement, and the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee and Expense Reimbursement under the terms of the Stalking Horse Agreement are necessary to preserve and enhance the value of the Debtors' estates.  The Debtors believe that the agreement to pay the Break-Up Fee and Expense Reimbursement on the terms of the Stalking Horse Agreement is necessary to induce the Debtors to enter into the transactions encompassed by the Stalking Horse Agreement and sets an appropriate floor for the value of the Acquired Assets, thus enabling the Debtors to obtain the highest and best possible price for the Acquired Assets.  Finally, the Debtors believe that the Break-Up Fee and Expense Reimbursement are each fair and reasonable under the circumstances of these cases.

47.     The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Break-Up Fee will

encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured. The Debtors believe that the Expense Reimbursement is also reasonable under the circumstances in light of the expenses incurred by the Stalking Horse Bidder.

48.     Providing a stalking horse bidder with certain bidding protections in connection with a sale of significant assets under section 363 of the Bankruptcy Code has become standard practice in chapter 11 cases. In the Third Circuit, break-up fees and expense reimbursements are considered administrative expenses and must be necessary to preserve the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999). In *O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a break-up fee. *See id*. First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, bidding protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*. Termination and similar fees are effective mechanisms for protecting bidders in connection with an asset sale and can be "important tools to encourage bidding and to maximize the value of the [d]ebtors' assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Put differently, these bidding protections enable a debtor to assure a sale to a contractually committed bidder at a price

the debtor believes is fair and reasonable, while providing the debtor with the opportunity to generate even greater value through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted) (internal quotation marks omitted).

49.    In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.    the presence of self-dealing or manipulation in negotiating the break-up fee;

b.     whether the fee harms, rather than encourages, bidding;

c.    the reasonableness of the break-up fee relative to the purchase price;

d.    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.    the correlation of the fee to a maximum value of the debtor's estate;

g.    the support of the principal secured creditors and creditors' committees of the break-up fee;

h.    the benefits of the safeguards to the debtor's estate; and

i.    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

50.    As set forth above, the Bid Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the

Acquired Assets and to therefore insist that competing bids be materially higher or otherwise better than as provided under the Stalking Horse Agreement—a clear benefit to the Debtors' estates.

51.     The Debtors submit that the Bid Protections reflect market terms for a transaction of this size and nature. *See, e.g.*, *In re The Rockport Co., LLC*, (No. 18-11145) (LSS) [Docket No. 146] (Bankr. D. Del. June 5, 2018) (approving break-up fee and expense reimbursement equal to approximately 4.3% of the purchase price); *In re Orexigen Therapeutics, Inc.*, (No. 18-10518) (KG) [Docket No. 231] (Bankr. D. Del. April 23, 2018) (approving break-up fee and expense reimbursement equal to approximately 7.3% of the purchase price); *In re The Weinstein Company Holdings LLC*, (No. 18-10601) (MFW) [Docket No. 190] (Bankr. D. Del. Apr. 6, 2018) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re ATopTech, Inc.*, (No. 17-10111) (MFW) [Docket No. 234] (Bankr. D. Del. Apr. 21, 2017) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re Phoenix Brands LLC*, (No. 16-11242) (BLS) [Docket No. 136] (Bankr. D. Del. June 8, 2016) (approving break-up fee and expense reimbursement greater than 5% of the purchase price).

52.     Most importantly, absent approval of the Bid Protections, the Debtors may lose the opportunity to obtain the highest and otherwise best offers for the Acquired Assets through the Auction process.  If the Court does not approve the proposed Bid Protections, the success of the sale process could be compromised, the competitive nature of any Auction could be undermined, and the estates could suffer accordingly.  The Bid Protections were negotiated at arm's length and in good faith with the Stalking Horse Bidder.  Moreover, the Stalking Horse

Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, officers, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors. Accordingly, the Debtors request that the Court approve the Bid Protections pursuant to in accordance with the terms of the Bidding Procedures Order and Stalking Horse Agreement, subject to the Court's later approval, as such bid protections will be in the best interest of the Debtors and their estates.

**C.    Approval of the Proposed Sale Is Warranted Under Section 363 of the Bankruptcy Code**

53.    Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely authorize a sale if it is based upon the debtor's sound business judgment. *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

54.    Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.

*See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002)

(adopting *Lionel* factors) (citing *Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In*

*re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors

that may be considered by a court in determining whether there is a sound business purpose for an

asset sale)).  As such, it follows that when a debtor demonstrates a valid business justification for

a decision, the presumption is that the business decision was made "on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company." *Official*

*Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R.

650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### D.    The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale

55.    A sound business justification exists where the sale of a debtor's assets are

necessary to preserve the value of the debtor's estate for the benefit of creditors and interest

holders.  *See, e.g.*, *Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts*

*Diaries of Penn., Inc.)*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R.

at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business

purpose . . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge

determining a § 363(b) application expressly find from the evidence presented before him . . . a

good business reason to grant" the sale).

56.    As set forth above, a strong business justification exists for a sale of the

Acquired Assets.  In light of the Debtors' financial condition, an orderly but expeditious Sale of

the Acquired Assets is critical to maximizing recoveries for all of the Debtors' stakeholders.

Moreover, a timely closing of the Sale is necessary under the Interim DIP Order, without which Debtors would not have been able to execute an orderly and value-maximizing sale process or fund these chapter 11 cases.

E.    **The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Assets**

57.    As set forth above, the Debtors believe that the Sale governed by the Bidding Procedures will yield a fair and reasonable price for the Acquired Assets.  The Bidding Procedures were designed to facilitate a robust and competitive bidding process and provide significant flexibility to do so.  The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process within the parameters of the Milestones.  The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare one or more bids for the Acquired Assets and to engage with bidders on an arm's length basis to work to improve the quality of their bids for the benefit of all parties in interest.

58.    A sale or sales governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Acquired Assets, but also the highest or best value for the Acquired Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties in interest in the chapter 11 cases.

F.     **The Successful Bidder(s) Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

59.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at \*9 (S.D.N.Y. May 10, 1993) (quoting *Abbotts Dairies*, 788 F.2d at 147)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

60.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)) (other citations omitted); *see also Kabro Assoc. of*

*West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

61.    As set forth above, the Bidding Procedures were designed with the goal of producing a fair and transparent sale process that will yield the highest or otherwise best value for the Acquired Assets. The Stalking Horse Bidder has engaged separate counsel to represent its interests in the negotiation of the Stalking Horse Agreement and in the sale process generally. The Debtors submit, and the testimony presented at the Sale Hearing will demonstrate, that the terms and conditions of the Sale will have been negotiated by the Debtors and the Stalking Horse Bidder or Successful Bidder, as applicable, at arm's length and in good faith, with the assistance of the Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

62.    The Debtors submit that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction will be required confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Acquired Assets. Any purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith.  As such, the Debtors request a finding that any Successful Bidder (including the Stalking Horse Bidder if it is the Successful Bidder) is a good-faith purchaser and is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code.

63.     In view of the foregoing, the Debtors have demonstrated that the proposed sale of their Acquired Assets should be approved as a sound exercise of their business judgment.

**G.     The Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code**

64.     In the interest of attracting the best offers, the Court should authorize the Debtors to sell the Acquired Assets free and clear of any liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

65.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

66.    The Debtors submit, and to the extent necessary will demonstrate at the Sale Hearing, that the sale of the Acquired Assets free and clear of all liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code. The proposed Sale satisfies one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the Acquired Assets.  For example, the Acquired Assets are subject to the liens of the Debtors' secured lenders, each of whom either have consented or are expected to consent to the Sale.  Additionally, any parties with junior liens on the Acquired Assets can be compelled to accept a money satisfaction of their interests, but also would be adequately protected by such liens attaching to the proceeds of the applicable Sale in the order of their respective priority.

67.    Moreover, the Debtors will send the Sale Notice to any other purported prepetition lienholders. If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on any of the Acquired Assets timely objects to this Motion

as it relates to the Sale (and not the Bidding Procedures), such party shall be deemed to have consented to any Sale approved at the Sale Hearing. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein). Accordingly, the Debtors request that the Court authorize the sale of the Acquired Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceed thereof in the same order of relative priority, with the same validity, force, and effect as prior to such.

68.    It is also appropriate to sell the Acquired Assets free and clear of successor liability relating to the Debtors' business. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is the successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale

permits a buyer to take ownership of property without concern that a creditor will file suit based

on a successor liability theory).

69.     The purpose of a sale order purporting to authorize the transfer of assets free

and clear of all claims, liens, and encumbrances would be defeated if claimants could thereafter

use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale

conduct. Moreover, without such assurances, potential bidders may choose not to participate in the

Auction or, if they did, would submit reduced bid amounts. To that end, the Successful Bidder

should not be liable under any theory of successor liability relating to the Debtors' businesses, but

should hold the Acquired Assets free and clear.

70.     Accordingly, the Debtors request that the Court authorize the sale of any of

the Acquired Assets free and clear of any liens, claims, interests and encumbrances, to the fullest

extent permitted by section 363(f) of the Bankruptcy Code.

## H.     The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code

71.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to

the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining

whether to approve a debtor's decision to assume or reject an executory contract or an unexpired

lease.   *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that

assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global

Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or

reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice).  In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

72.    The proposed Sale will provide a Successful Bidder with the opportunity to designate the Potential Assumed Contracts for assumption and assignment.  Assumption and assignment of any Potential Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts in connection with any Sale is an essential element in the Debtors' ability to maximize the value of the Acquired Assets—particularly so when a Potential Assumed Contract is integral to the ownership or operation of the Acquired Assets to be acquired.  Further, the ability to assume and assign necessary Potential Assumed Contracts will increase the likelihood that the Debtors will be able to sell the Acquired Assets, thereby avoiding needless value-destruction through a liquidation of otherwise marketable operating assets.

73.    The consummation of any Sale involving the assignment of a Potential Assumed Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults under the Potential Assumed Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.  *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of any Potential Assumed Contracts will be

dependent upon payment of Cure Amounts and effective only upon the closing of an applicable Sale. As set forth above, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice setting forth the Debtors' calculation of the Cure Amounts for each Potential Assumed Contract that could be assumed in connection with a Sale.

74.       Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance ... whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2). While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language ... from Section 2609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations."). While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

75.     Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business, and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

76.     The Bidding Procedures expressly specify that for a bid to qualify as a Qualified Bid a prospective bidder must include with its bid adequate assurance information regarding the prospective bidder's ability to perform the applicable obligations under any Potential Assumed Contracts that may be included in the bid. Accordingly, the proposed Assumption and Assignment Procedures are carefully designed to ensure that Counterparties receive timely and sufficient notice with respect to the disposition of their Potential Assumed Contracts. In light of the foregoing, the Debtors' assumption and assignment of any Potential Assumed Contracts in accordance with the proposed Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

77.     Finally, in order to facilitate the assumption and assignment of Potential Assumed Contracts in furtherance of maximizing the value of the Acquired Assets, the Debtors further request that the Court find that any anti-assignment provision included in any Potential Assumed Contract, whether such provision expressly prohibits, or has the effect of restricting or

limiting assignment of a Potential Assumed Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[9]

### I.    The Designation Rights Set Forth the Stalking Horse Agreement Are Appropriate

78.     The Stalking Horse Agreement contemplates that the Stalking Horse Bidder will be permitted to designate executory contracts and unexpired leases as assumed or rejected for a limited period after the Closing Date.  The designation rights allow the Successful Bidder to receive the benefits of certain Potential Assumed Contract while it considers whether to have the Potential Assumed Contracts assumed and assigned or rejected.  Under the designation rights, the counterparties will be compensated pursuant to the terms of their Potential Assumed Contract.  The Stalking Horse Bidder has required this concept as an essential condition of the Stalking Horse Agreement but such designation rights will be available to any Successful Bidder.

79.     The designation rights will provide the Successful Bidder and the counterparties to Potential Assumed Contracts with an opportunity to negotiate the Potential Assumed Contracts prior to a decision regarding whether to assume and assign or reject the Potential Assumed Contract.  Ultimately, this is expected to result in the Successful Bidder continuing business relationships with more counterparties to Potential Assumed Contracts than if

---

[9]Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease .... " 11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

all decisions related to Potential Assumed Contracts were forced to be made on or before the Closing.

80.     Bankruptcy courts in this District and other jurisdictions have approved similar designation rights. *See*, *e.g.*, *In re Francesca's Holdings* Corporation, Case No. 20-13076 (BLS) (Bankr. D. Del. Jan. 22, 2021) (sale order approving designation rights period extending up to 150 days after closing date); *In re Alpha Entm't LLC*, Case No. 20-10940 (LSS) (Bankr. D. Del. Aug. 7, 2020) (sale order approving designation rights period extending through the earlier of (a) plan confirmation occurring no earlier than 70 days after closing date, or (b) 90 days from and after closing date); *In re Brooks Bros. Grp., Inc.*, Case No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020) (approved bidding procedures order for stalking horse agreement providing for designation rights period extending post-closing until the later of plan confirmation or Dec. 31, 2020); *In re PQ New York, Inc.*, Case No. 20-11266 (JTD) (Bankr. D. Del. June 29, 2020) (order approving private sale with post-closing date designation deadline 10 days following entry of sale order); *In re Sugarfina, Inc.*, Case No. 19- 11973 (MFW) (Bankr. D. Del. Oct. 15, 2019) (approved bidding procedures order for stalking horse agreement providing for designation rights period extending 90 days from and after closing date); *In re RM Holdco LLC*, Case No. 18-11795 (MFW) (Bankr. D. Del. Sept. 6, 2018) (same).

## REQUESTS FOR IMMEDIATE RELIEF & WAIVER OF STAY

81.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bidding Procedures Order, and any Sale Order, as well as any other separate order authorizing the assumption or assumption and assignment of a

Potential Assumed Contract in connection with the Sale.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

82.    As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders. Accordingly, the Debtors submit that ample cause to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## NOTICE

83.    The Debtors have or will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the agent under the Debtors' postpetition credit facility; (d) counsel to the lenders under the Debtors' prepetition credit facilities; (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) any party that requests service pursuant to Bankruptcy Rule 2002; and (h) any known party asserting a lien on the Debtors' assets.

## <u>NO PRIOR REQUEST</u>

84.    No prior request for the relief sought herein has been made to this Court or any other court in connection with the chapter 11 cases.

85.     WHEREFORE, the Debtors respectfully request that the Court grant the

relief requested in this Motion, enter the Bidding Procedures Order, substantially in the form

attached hereto as Exhibit A, and grant such other and further relief to the Debtors as the Court

may deem proper.

Dated: December 9, 2022
      Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/  Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
          tcairns@pszjlaw.com
          mcalloway@pszjlaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*