## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter: 11 |
| MEDLY HEALTH INC., *et al.*,[1] | Case No. 22-11257 (KBO) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 15 & 71 |

**OBJECTION AND REQUEST FOR ADJOURNMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO STALKING HORSE AGREEMENT AND TO PROVIDE BID PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND FOR  RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned case of Medly Health, Inc., *et al.* ("Medly" and/or the "Debtors"), by and through its proposed undersigned counsel, submits this objection (the "Objection") to the Debtors' motion for entry of (i) an order substantially in the form attached hereto as Exhibit A, (the "Bidding Procedures Order"), (a) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), to be used in connection with the sale (the "Sale") of substantially all of the Debtors' Pharmaca business and certain other assets (collectively, the "Acquired Assets") to MedPharmaca Holdings, Inc. (the

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Medly Health Inc. (3391); Care Well Pharmacy, Inc. (9048); Grubbs Care Pharmacy NW Inc. (0490); Marg Pharmacy, Inc. (5838); Medly Atlanta Inc. (7312); Medly Baltimore Inc. (2354); Medly Bedford Ave Pharmacy Inc. (3690); Medly Bristol Inc. (4556); Medly Bronx Inc. (4741); Medly Chicago Inc. (5231); Medly Dallas Inc. (7581); Medly DC Inc. (9403); Medly Enterprise LLC (8898); Medly Grand Central Inc. (1741); Medly Houston Inc. (7443); Medly Jersey City Inc. (5677); Medly Mail Service Pharmacy LLC (9203); Medly Miami Inc. (8101); Medly Orlando Inc. (7581); Medly Pharmacy Inc. (4606); Medly Pharmacy PA Inc. (8494); Medly Pittsburgh Inc. (8381); Medly Queens Inc. (9623); Medly Raleigh Inc. (5140); Medly San Antonio Inc. (9973); Medly Stamford Inc. (4966); Medly Tampa Inc. (5128); Medly UCHC Pharmacy Inc. (6672); Medly Utah Inc. (4648); Pharmaca Integrative Pharmacy, Inc. (0334); Tango340B LLC (4781); and West Campbell Pharmacy Inc. (2931). The Debtors' business address is 7088 Winchester Circle, Suite 100, Boulder CO 80301.

"Stalking Horse Bidder"), or alternatively, to such other bidder that submits the highest and best bid for the Acquired Assets at auction, (b) authorizing the Debtors to provide a break-up fee and expense reimbursement, as provided in the Stalking Horse Agreement ("Stalking Horse APA"), (c) scheduling an auction of the Acquired Assets and scheduling the hearing to approve the Sale, (d) approving the form and manner of notices of the proposed sale hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, (e) authorizing procedures governing the potential assumption and assignment of the Debtors' certain executory contracts and unexpired leases in connection with the Sale, (each a "Potential Assumed Contract" and together, the "Potential Assumed Contracts"); and (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assumed Contract and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 3; and (ii) an order (a) authorizing the sale of the Acquired Assets free and clear of all liens, claims, interests, and encumbrances provided with such liens, claims, interests and encumbrances to attach to the proceeds of such sale, (b) authorizing the assumption and assignment of Potential Assumed Contracts; and (c) granting related relief [Dkt. No. 15] (the "Motion").[2]    The factual predicates for the Motion are supported only by the Declaration Of Richard Willis In Support Of The Debtors Chapter 11 Petitions And First Day Relief ("Willis Affidavit").  In support of this Objection, the Committee respectfully states as follows:

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

7199122

## RELIEF SOUGHT BY THE COMMITTEE

1.      The Committee requests that the Court:  (i) deny this Bid Procedures Motion in its entirety; (ii) adjourn[3] this Bid Procedures Motion out two (2) weeks through January 17, 2022, or (iii) grant the Bid Procedures Motion, but only if the modifications requested herein are made, including, but not limited to, an extension of the proposed 10-day sale timeline to six (6) weeks.

## PRELIMINARY STATEMENT

2.      The Committee consists of five (5) members owed at least $12,338,731 in the aggregate.  It stands as the statutory representative of the $47 million[4] of unpaid and accrued unsecured trade debt in this case.  The Committee was appointed on December 21, 2022, selected counsel on December 22, had its first call with counsel on December 23, and selected financial advisors the next business day, which was December 27.  Beginning on December 23, the Committee began requesting an open line of communication with the Debtors' CEO Mr. Willis, and/or other financial professionals within the Debtors' organization.  Unfortunately, due to Mr. Willis's trip to Europe over the entire period of time that the Committee was making these requests, and his insistence that he be a part of any discussions between anyone on the Debtors' staff and the Committee's financial advisors, no such discussions whatsoever occurred until Sunday, January 1, 2023,  and only in the format of a deposition of Mr. Willis.[5]

3.      A number of creditors here, including committee member Sun River Health, owed over $1 million,[6] is a 501(c)(3) Federally Qualified Health Center ("FQHC") owed funds by the Debtors pursuant to the 340(b) Federal Rebate program.  Sun River and other FQHCs like it who

---

[3] Citing the Stalking Horse APA milestones and the budget, Debtors' counsel did not consent to adjourning the hearing on the Motion.

[4] *See* Willis Affidavit, ¶39.

[5] Typically, a debtor's FA and/or Investment Banker will immediately open a line of communication with Committee's FA.  But the Debtors do not have an FA or an Investment Banker here.

[6] The Debtors' list of 30-largest creditors lists a total of $941,737.66.

3

are creditors of the Debtors, are engaged in providing essential medical, dental, behavioral and mental health services to a predominately indigent population. These FQHCs rely upon revenues under the 340(b) to survive in connection with providing critical services on a charitable basis. Under the Debtors' proposed Sale process in this case, there will be no distribution whatsoever to Sun River, any other not-for-profit FQHC creditor, or any of the remaining $46 million in trade creditors.

4.      The Committee is not opposed to a sale of the Debtors' business and operating assets ("Business Assets") through a fair and robust process that maximizes value. The proposed sales process, however, is replete with red flags and appears abusively orchestrated to ensure that potentially significant and valuable claims and causes of action (collectively, the "Litigation Claims") will be delivered to the Stalking Horse Bidder to either be buried, or pursued for the benefit of the Stalking Horse Bidder and its affiliates, which include the proposed DIP Lender[7] and the purported second lien-holder (the "Prepetition TPC Lenders" and together with the DIP Lender, collectively referred to herein as "TPC"), which may also be targets of such litigation. TPC's second lien position is also shared, pari passu, with insiders of the Debtors[8], requiring analysis as to whether, under the law, the entire $81 million TPC claim should be deemed an insider claim. Among other things, such a determination raises the level of scrutiny required of the Court in evaluating the Stalking Horse Bid, presented by an affiliate of TPC.

5.      Through the proposed one-two punch of the instant Motion and the DIP Motion (defined below), the Debtors seek to deploy this highspeed financing and sale process with very little disclosure coming right out of the holidays under severe time constraints that appear purely

---

[7] The DIP Lender is TriplePoint Venture Growth BDC Corp. (which is also collateral agent), TriplePoint Capital LLC and TriplePoint Private Venture Credit Inc. DIP Motion, ¶12. These same three entities constitute the Debtors' purported second lien holder owed $81 million. *See*, DIP Motion, Ex. A.
[8] Debtors' First Day Affidavit, Doc 3, at paragraphs 36-37.

7199122

manufactured in light of, *inter alia*, the extensive prepetition planning, store liquidations,[9] financings, and negotiations with the purported secured creditors.[10]    Indeed, these Bid Procedures contemplate an accelerated sale process wherein the Sale Notice is filed and served no later than this coming Friday, January 6, 2023, and publication notice of the sale is "as soon as practicable" but bid packets are due this coming Sunday, January 8?  Due process can often be truncated in bankruptcy cases based on exigencies, but this is no process.

6.    What is the result of the Debtors' proposed Bid Procedures?  An assurance that substantially all of the Debtors' assets (including causes of action) are delivered to the Stalking Horse Bidder, affiliated with the Second Lienor, TPC, sharing its liens pari passu with insiders, and leaving nothing for the $47 million unsecured creditor body.  *See* Willis Affidavit, ¶39.

7.    One of the key assets being sold is an asset that TPC's liens do not extend to, and that it could therefore not get its hands on[11] absent having its affiliate serve as the Stalking Horse bidder to purchase those assets:  to wit, the Litigation Claims. These may be the only valuable assets in this case.   And in a Chapter 7, they would be pursued for the benefit of the unsecured creditors.

8.    Perhaps in no other bankruptcy case before this has a Section 363 sale asset ever been so shrouded in mystery.  The Willis Affidavit reveals that in August of 2022, the Debtors discovered accounting, operation and financial "irregularities" at Medley which lead to a wholesale management and governance termination, purge and restructuring.  *See* Willis

---

[9] The Willis Affidavit describes how the Debtors closed most of its stores and terminated most of its employees in August 2022. Willis Affidavit, ¶46.

[10] Among other things, the Debtors obtained an additional $10 million term loan in August 2022, as well as $1 million in bridge financing from the Prepetition TPC Lenders, which required an amendment to existing subordination agreement with first lienholder, Silicon Valley Bank ("SVB"), and a new intercreditor agreement with the Noteholders.  *See, e.g*., Willis Affidavit, ¶¶33-34.

[11] Upon information and belief, although not disclosed in the Motion, via a side-agreement between the affiliated Stalking Horse bidder and TPC, the Litigation Claims assets will be transferred to TPC once acquired by the Stalking Horse.

7199122

Affidavit at paragraphs 5, 33 & 44.  At his New Year's Day deposition, Mr. Willis who was the CFO at the time the irregularities were discovered, advised that he advised the board about the "irregularities," that Kirkland and Ellis ("Kirkland") and Alix Partners ("Alix") were jointly retained to investigate the "irregularities," that Alix worked through the Debtors systems and books and records over the next two months, and that there may or may not be a report from Alix on their findings about these "irregularities," but he's never seen it and Kirkland won't release it. [*See* Deposition Transcript of Richard Willis dated January 1, 2023 28:25-31:17].

9.     When Committee counsel pressed on to learn more about the Litigation Claims stemming from these "irregularities," which are assets proposed to be delivered to the Stalking Horse under this anti-competitive timeframe, counsel to the Debtors directed Mr. Willis not to answer the questions.  [*See* Deposition Transcript of Richard Willis dated January 1, 2023, 36:14-37:20].

10.     This truncated timeline combined with the proposed sale of Litigation Claims before their nature, substance and value are adequately exposed effectively rids the estates of any investigative rights and ensures that the Committee and its professionals cannot be a meaningful part of this warp speed process.  The manufactured need for speed in these cases must be balanced against the obligation of the Debtors and the Committee to properly exercise their fiduciary obligations and the Committee's responsibility to shed appropriate light on the relief sought by the Debtors for the benefit of the creditors of these bankruptcy estates and the Court.

11.     Indeed, the Debtors' Litigation Claims cannot be adequately considered, investigated or pursued under any framework that looks remotely like the one proposed by the Debtors.  For these reasons and the others set forth herein, unless the sale process is extended and the Litigation Claims preserved outside of the proposed sale process, the Motion should be

entirely denied as, among other things, fostering a sale process that runs afoul of the Bankruptcy Code's primary goal of maximizing value for a debtor's estate and all of its creditors.

12.     Additionally, aside from removing the Litigation Claims from the sale and expanding the sale timeline, the Committee requests modifications to specific components of the proposed Bidding Procedures and Assumption Procedures in order to ensure a fair, transparent and value-maximizing process. The Committee respectfully submits that, unless all issues raised herein are adequately addressed, the Motion should be denied at this time.

## BACKGROUND

13.     On December 9, 2022 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.     On December 21, 2022, the United States Trustee for the District of Delaware appointed a five (5) member Committee in the Debtors' Chapter 11 cases.  The Committee has, subject to Court approval, retained Porzio Bromberg & Newman, P.C. as its counsel, and Rock Creek Advisors LLC as its financial advisors. Porzio's first call with the Committee was on Friday, December 23, 2022 and its first call with its newly retained financial advisor was on December 28, 2022 (Rock Creek Advisors having been selected by the Committee on December 27th).

### The DIP Motion

15.     On December 9, 2022, the Debtors filed a motion for interim and final orders (i) authorizing the Debtors to obtain up to $8 million in secured superprioirity post-petition

7

7199122

financing from the DIP Lender, which is affiliated with the Stalking Horse Bidder, (ii) granting priming liens and superpriority administrative expense status and (iii) authorizing use of cash collateral, (iv) granting adequate protection, and (v) scheduling a final hearing, and (vi) granting related relief [ECF No. 14] (the "DIP Motion").

16.     On December 13, 2022, an interim order was entered approving the DIP Motion on an interim basis [ECF No. 73] (the "Interim DIP Order").  A final hearing on the DIP Motion is scheduled for January 9, 2023.

**The Bid Procedures Motion**

17.     On December 9, 2022, the Debtors filed the instant Motion.

18.     The Motion relies solely on the Willis Affidavit, which fails to even describe the Motion itself, making instead only general reference to it as ". . . the Debtors will seek approval of bid procedures for the sale of the Pharmaca business line, which includes twenty-two stores, as a going concern. The Debtors have identified a buyer to act as a stalking horse in such sale. The Debtors believe pursuing both sales in these Chapter 11 Cases is the best path forward and is in the best interests of their estates and creditors."  Willis Affidavit, ¶7.

19.     Neither the Willis Affidavit nor the Motion describe the Debtors' retention of any appropriate professionals in support of the relief sought, including financial advisors or independent directors (which is uniquely troublesome in light of the recently discovered "accounting irregularities" described in the Willis Affidavit).  Indeed, rather than seek outside professional guidance and review, it appears the Debtors promoted its Chief Financial Officer to Chief Executive Officer upon the discovery of such "irregularities," and it is he who is listed as the party to be contacted by prospects interested in possibly bidding on the assets (notwithstanding the fact that Debtors advised that Mr. Willis is unavailable this week following

8

Christmas and traveling in Europe when asked for his availability both to meet with the Committee informally and to appear for a deposition). Willis Affidavit, ¶1; *see* Bidding Procedures Order, Ex.1, Bidding Procedures, I. Mr. Willis has also advised the Committee's professionals that he must be on all calls between the Committee's financial advisors and anyone on the Debtors' staff.

20.    The Motion is similarly devoid of reference to retaining an investment banker, which has all but become a prerequisite to a fast-tracked bidding procedures/sale motion like this one. Absent too is the typical information one expects in such motion, including a description of marketing information, a data room with diligence information for prospective purchasers, the number prospects contacted regarding potential interest in the Debtors' assets, or other similar factual predicates.[12] Instead, the Motion states without any certification in support and therefore without evidentiary effect, that:

> The Debtors faced severe liquidity and operational challenges in the summer and fall of 2022. During this time frame, the Debtors reached out to several parties, including certain of their competitors, to determine any interest in either a potential financial restructuring or sale of the Debtors' business. While several parties executed nondisclosure agreements and performed certain diligence on the Debtors' business, no offers were received.

Motion, ¶19. With respect to marketing of the assets, the Motion further states that "The Debtors will send (to the extent not already provided), notice of this Motion to all parties that they believe may be potentially interested in acquiring the Acquired Assets, including to the parties contacted prepetition." Motion, ¶22. Such parties are not identified or described.

21.    With respect to the sale of the Debtors' Litigation Claims, the Motion states:

> The Stalking Horse Agreement provides for the sale of all Claims and Retained Litigation (each as defined in the Asset Purchase

---

[12] The Committee has requested, but has not yet received, information from Debtors regarding any prior sales processes.

Agreement), which would include claims held by the Debtors with respect the founding group's actions and may include claims for fraud and breach of fiduciary duty. The Debtors have not determined what, if any, Claims exist as a result of the above-referenced conduct (or otherwise), have not ascertained the nature, extent or scope of those Claims and have not conducted any analysis regarding the potential value of such claims to their estates.

Motion, ¶16.

22.     The Stalking Horse Agreement seeks to sell the Acquired Assets to the Stalking Horse Bidder, subject to higher and better bids, in consideration of payment to the Debtors of $18,500,000 as the Base Purchase Price, which is subject to aggressive adjustments that make it impossible to gauge the actual amount of the stalking horse bid:

> The consideration for the Acquired Assets shall be (i) an amount in cash equal to the sum of (A) Eighteen Million Five Hundred Thousand Dollars ($18,500,000) (the "Base Purchase Price"), minus (B) the Inventory Shortfall, minus (C) the Accounts Receivable Shortfall, minus (D) the Prepaids Shortfall plus (E) the Inventory Excess, plus (F) the Accounts Receivable Excess, plus (G) the Prepaids Excess (collectively, the "Purchase Price") and (ii) the assumption by Buyer of the Assumed Liabilities pursuant to the Assignment and Assumption Agreements.

Stalking Horse APA, § 2.1(a).   In any event, even without  adjustments, such amount is insufficient to pay off the purported first lienholder, SVB, thereby leaving unsecured creditors with nothing.[13]

**OBJECTIONS**

23.     The Debtors' request for entry of the Bidding Procedures Order should be denied, unless modified as requested herein, because the Bidding Procedures Order and the exhibits

---

[13] The budget included with the Interim DIP Order indicates $7,994,000 will be paid to the first purported lienholder, SVB during the week ending February 11, 2023.   The Debtors assert that SVB is owed $20 million (*see* Willis Affidavit, ¶31), and also that the original SVB Loan Agreement was executed by the four (4) Debtors in existence at that time, but that new stores or acquired entities executed a joinder to the SVB Loan Agreement (*see* Willis Affidavit, n.2).

7199122

attached thereto, do not provide for a full and fair opportunity to maximize the value of the Debtors' assets.

### A.   <u>**Legal Standard**</u>

24.     One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of creditors. *Matter of Midway Airlines, Inc.*, 6 F.3d 492, 494 (7th Cir. 1993); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (a debtor, as a fiduciary to the estate, has a duty to maximize the value of the estate). To further this purpose, such procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value).

25.     The Debtors submit that they have sound business justification for pursuing the relief sought in the Motion. *See* Motion, at ¶55.  The Court, however, should not merely defer to the Debtors' "sound" business judgment; indeed, the Court need not consider the Debtors' business judgment in matters of process under the Bankruptcy Code, but should instead assess the fairness and reasonableness of the proposed Bidding Procedures. *See In re American Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) Tr. at 132-33 ("I don't think, as the debtors suggest, that my consideration of Bidding Procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case; to determine what is fair for all the parties.").

7199122

26.     The Motion states that "[t]he Stalking Horse Bidder is not an insider of the Debtors.  [But t]he Stalking Horse Bidder is affiliated with the Prepetition TPC Lenders and the DIP Lender."  Motion ¶17.  However, the actual affiliation between the Stalking Horse Bidder and the Prepetition TPC Lenders and the DIP Lender is nowhere defined. And this is in the face of the fact that the proposed procedures require that each bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer, including for entities formed for the purpose of consummating the proposed Transaction), and the complete terms of any such participation.  *See* Bidding Procedures Order, Ex. 1, proposed Bidding Procedures, II(j). It is further unclear whether the Prepetition TPC Lenders and the DIP Lender constitute "insiders," since despite the Debtors simple statement to the contrary, insiders include "persons in control."  *See* 11 U.S.C. § 101(31)(B) (describing insiders of a corporation as directors, officers, persons in control, etc.). Transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C.* (*In re Crown Vill. Farm, LLC*), 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.*), 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008

12

Bankr. LEXIS 896, 26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required by non-bankruptcy law for insider transactions"); *In re Univ. Heights Ass'n,* 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders on both sides of the transaction, the proposed sale is subject to heightened scrutiny.").

27.     "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).  The Debtors bear the burden of proving that their proposed transaction satisfies the heightened standards applicable to insider transactions. *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, 26-29.  Under the "entire fairness" standard, the challenged transaction must be demonstrated to involve fair dealing (which entails an examination of the timing, initiation, structure, negotiation and disclosure of a transaction), and fair price (which entails an examination of the economic and financial considerations of the transaction).

> **B.**     **The Bidding Procedures Are Neither Fair Nor Reasonable And Are A Threat To Maximizing The Value Of The Estates.**

28.     There is nothing fair in the proposed process sought to be approved by the Motion.  The "process" hands the Debtors' potentially most valuable assets (including all claims and causes of action) to the proposed Stalking Horse Bidder (which is affiliated with the DIP Lender). *See In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (prohibiting "convert[ing] the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender."); *see generally, In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) (reversing order authorizing section 363 sale of substantially

7199122

all of a debtor's assets because if sale was approved there would be "little prospect or occasion for further reorganization."); *In re Encore Healthcare Assocs.*, 312 B.R. 52, 54–55 (Bankr. E.D. Pa. 2004) (denying Motion and finding that a section 363 sale served no legitimate business purpose when debtor admitted that it would convert the case to chapter 7 following the sale, and would not have adequate funds to proceed with an administratively solvent estate).

29.    Bidding procedures must be designed to ensure that the process does not discourage potential bidders from participating in the process.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring greater benefit to the estate).  As submitted, the Bidding Procedures, which envision a 10-day process, completely deter competitive bidding and provide unnecessary and unwarranted bid protections for Stalking Horse Bidder.

### C.    The Debtors' Litigation Claims Should Not Be Sold.

30.    Analysis of whether the Debtors' claims and causes of action can or should be sold is inherently fact-intensive, and approval should be denied where there are insufficient facts. For example, in *In re Exaeris, Inc.* a Chapter 11 debtor filed a motion for authority to sell substantially all of the debtor's assets to an insider on terms that included a credit bid of insider's $2.1 million claim for postpetition financing he provided and a release of whatever claims the estate might have against him, but the Court held that the sale could not be approved based, *inter alia*, on a dearth of evidence of efforts to market the assets and lack of evidence as to value of assets being sold.  *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

31.    Any proposed sale of any claims and causes of action is both a sale of a debtor's assets outside the normal course of business and a compromise that must therefore meet heightened scrutiny and "fair and equitable" tests governing compromises. *In re Lahijani*, 325

B.R. 282, 284 (9th BAP 2005).  In addition, a proposed sale must be made in "good faith." *In re*

*Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir.1986).

> We now conclude that, when a cause of action is being sold to a present or potential defendant over the objection of creditors, a bankruptcy court must, in addition to treating it as a sale, independently evaluate the transaction as a settlement under the prevailing "fair and equitable" test, and consider the possibility of authorizing the objecting creditors to prosecute the cause of action for the benefit of the estate, as permitted by § 503(b)(3)(B). Accordingly, we REVERSE the order approving the sale of the estate's causes of action under § 363.

*In re Lahijani*, 325 B.R. at 284.

> [U]nder the "fair and reasonable" test laid out by the Supreme Court . . . courts are instructed to apprise themselves "of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. . . the Third Circuit, in *Martin*, set forth four criteria that a bankruptcy court should consider in striking a balance between the "value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393. Those criteria are: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Id.*

*Travelers Cas. & Sur. Co. v. Future Claimants Representative*, 2008 WL 821088, at *4–5

(D.N.J. Mar. 25, 2008) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir.

1996)).

32.    In the present matter, the record is not adequately developed to support an

analysis of the *Martin* settlement factors, nor could it be in this strategically designed process.

The Stalking Horse Bidder seeks to purchase causes of action, such as most claims under

15

Chapter 5 of the Bankruptcy Code or other applicable law, as well as actions against current or former officers of the Debtors and affiliates, without providing any analysis or information about the merit or potential value of such claims. The Motion discloses only the following blanket assertions with respect to such claims:

> The Stalking Horse Agreement provides for the sale of all Claims and Retained Litigation (each as defined in the Asset Purchase Agreement), which would include claims held by the Debtors with respect the founding group's actions and may include claims for fraud and breach of fiduciary duty. The Debtors have not determined what, if any, Claims exist as a result of the above-referenced conduct (or otherwise), have not ascertained the nature, extent or scope of those Claims and have not conducted any analysis regarding the potential value of such claims to their estates.

Motion, ¶ 16. Indeed, the Motion does not even discuss the limits of any possibly applicable insurance policies. Accordingly, we do not know, nor can we know, what causes of action are being sold given the Debtors' minimal disclosures. All we know right now is that there were prebankruptcy transactions, acts and/or omissions that may have resulted in destruction of the Debtors' assets.

33. The Litigation Claims, which includes claims potentially valuable here, such as claims for undercapitalization, lender liability, subordination, recharacterization, breach of fiduciary duty, malpractice claims against accountants and auditors, fraudulent conveyances, and all intercompany activity by the Debtors and related nondebtors alike, must be subjected to a thorough investigation, which requires material revisions to the timeline. The Committee requires the platform provided for by the Bankruptcy Code for investigating, and if necessary, funding and bringing litigation. *See, e.g.*, 11 U.S.C. § 108 (providing that the Debtors may commence action for up to two years after the petition date). The Motion, however, asks the

16

Court to approve a process that inappropriately ties one of the Committee's hands behind its back and shackles both of its legs.

34.     It also is effectively an inappropriate *sub rosa* plan insofar as the Motion also attempts to approve procedures for the sharing on account of the Litigation Claims' recovery, which has the Stalking Horse Bidder receiving the first $20 million, i.e., more than its purchase price, plus fees, costs and other expenses. *See* Stalking Horse APA §2.1.

35.     Accordingly, the Debtors' Litigation Claims should not be sold or subject to the rights-destroying process proposed in the Motion.

### D.     The Proposed Sale Timeline Is Not Adequately Supported.

36.     The Debtors seek approval of an accelerated sale process that ends with a Bid Deadline just only ten (10) days after the hearing on the Motion while simultaneously failing to provide, and stripping away, value. The Motion does not provide adequate support for the proposed timeline.  Rather, the Motion simply asserts that the short timeline is needed, not to promote a meaningful sale process, but solely to comply with milestones in connection with the DIP facility provided by affiliates of the Stalking Horse Bidder.  *See* Motion, ¶11. It is a cozy relationship indeed when the DIP lender is affiliated with the stalking horse bidder and the prepetition secured lender and therefore, acting as "lender" can insist on strict milestones which favor its affiliate stalking horse and chill bidding as to all others.  The Court should not countenance this, particularly in a case that by design proposes zero value for unsecured creditors.

37.     As already previewed, the proposed break-neck pace sought by the Debtors may achieve nothing other than delivering the Debtors' assets to the Stalking Horse for inadequate consideration.  Absent the manufactured emergency that is the obvious product of pre-petition

planning there is simply no legitimate justification for the process proposed here based upon the facts shared to date.

38.     As will be more thoroughly explained in the Committee's objection to the DIP Motion, the Committee also believes the budget supports additional time needed here to run a value maximizing sale process.   Among other things, the nine (9) week budget includes the following disbursements: an egregious $2,875,000 for "Professional Fees—Lender" which is nearly 50% of the purported $6.6 million proposed to be advanced under the DIP loan; $587,000 for "SVB Interest and fees" (despite the fact that SVB is admittedly purported undersecured and should therefore receive no fees); and $19,143,000 on inventory purchases, which is being purchased by Stalking Horse Bidder for only $18.5 million less certain adjustments. Furthermore, the DIP Lender and the Debtors' Stalking Horse Bidder are affiliates. Will the alleged losses evaporate the moment the sale closes?  Of course not, the DIP Lender/Stalking Horse Bidder will be funding them the day after the closing in the same way they are funded the day before the closing.  Moving the bid procedures date out, as well as the proposed bid and sale dates out, changes nothing in terms of economic risk to the DIP Lender/Stalking Horse Bidder.

39.     Information regarding the assets is also completely lacking.  As already discussed, the Debtors' description of the accounting "irregularities" is woefully deficient.  And there are additional provisions in the Stalking Horse APA that give pause.  For example, in section 6.3 of the Stalking Horse APA states:

> Section 6.3 Further Assurances. (a) At the request and the sole expense of the requesting Party, either Party shall, at any time after the Closing Date, execute and deliver such documents as the other Party or its counsel may reasonably request to effectuate the purposes of this Agreement, including documents and information determined by Buyer to be necessary or appropriate to enable Buyer to pursue any Claim. Without limiting the foregoing, Seller shall promptly after the Closing Date request in writing that

> Kirkland & Ellis provide to Buyer, at Buyer's sole expense, that certain report prepared by Alix Partners for Kirkland & Ellis. Buyer expressly acknowledges that Seller has given no assurances whatsoever (i) that Kirkland & Ellis will comply with such request and that Seller has no obligation to take any further action beyond making the initial request, or (ii) as to the substance of such report. Buyer further acknowledges that to the extent such report is provided to Buyer, it is without waiver of Seller's attorney-client privilege rights, all of which are hereby expressly reserved pursuant to Section 1.1(r) hereof; provided, further, that nothing in this Section 6.3(a) shall be deemed to preclude Buyer from reviewing and using the report itself, if provided, in connection with the prosecution of any Claims; provided, further, notwithstanding anything in this Agreement or otherwise to the contrary, Buyer and its successors, assigns and affiliates are expressly permitted and authorized to receive, review, use, disclose, and rely upon the report itself, if provided, and any information contained therein for any purpose in connection with the investigation and prosecution of any litigation, claims or causes of action against any Person, including without limitation, the Claims.

Stalking Horse APA, §6.3.  In all of the Debtors' pleadings, this appears to be the only reference to a "report" and to Alix Partners or Kirkland & Ellis, to which the Debtors are apparently trying to claim some attorney client privilege over even though the Debtors do not admit to even having possession of it.  This report was very clearly a discussion point between the Stalking Horse Bidder and the Debtors, so why is it hidden without further disclosure?  Does the report analyze the accounting irregularities?  Does it provide a roadmap for the Litigation Claims, likely the only possible basis here for unsecured creditor recoveries?  Neither the parties, nor the Court, are advised and are therefore left to guess. Additionally, it appears that even the Stalking Horse Bidder believes that insufficient information has been provided and has built in a diligence out—

> [T]he various Schedules contemplated by this ARTICLE 4 and any other provision of this Agreement shall be prepared by Seller and delivered to Buyer no later than the earlier of (i) ten (10) calendar days following the Effective Date [i.e., December 19, 2022] or (ii) six (6) calendar days prior to the first hearing for the Bankruptcy Court to approve the Bid Procedures Order [i.e., December 28,

19

> 2022]. For a period of five (5) calendar days after receipt of all
> such Schedules, Buyer shall be afforded the opportunity to review
> and either accept or reject the Schedules, in each case in its
> reasonable discretion. Should Buyer accept the Schedules (or
> should Buyer fail to reject them in writing by not later than the five
> (5) calendar day period set forth in the immediately preceding
> sentence, in which event, the Schedules as presented by Seller shall
> conclusively be deemed to have been approved by Buyer), the
> Schedules shall be appended to this Agreement and become a part
> hereof. Should Buyer reject the Schedules in writing by the end of
> such five (5) calendar day period, Buyer shall be entitled to
> terminate this Agreement in accordance with ARTICLE 10.

Stalking Horse APA, §4.1.  The Committee is not aware of the Stalking Horse APA's schedules having been completed, and has not received copies of any of them.  Additionally, the Debtors have not yet filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements"). While the Committee has propounded initial diligence requests for information and although the Debtors have begun to provide responses and diligence information to the Committee, none of it goes to the issues.  The Committee requires sufficient access to information (and a reasonable timeline) to be able to evaluate the value of the consideration being provided to the Debtors in exchange for these assets, which of necessity, must include an analysis of any Litigation Claims.

40.     Moreover, the Debtors provide zero information regarding any pre-petition marketing process.  Even if the prepetition marketing process was sufficiently robust, the timeline contemplated is untenable.  The Debtors propose a Bid Deadline of January 13, 2023, such that from the date the Motion is first considered, there would be only ten (10) days to market the assets, essentially leaving third party potential bidders with no time to seek, obtain, or review due diligence materials, let alone submit a bid.[14]  Additionally, the Debtors are seeking up

---

[14] Currently the due diligence period is set to will end on the Bid Deadline (i.e., January 13, 2023), and, subsequent to the Bid Deadline, the Debtors will have no obligation to furnish any due diligence information.  See Bidding Procedures Order, Ex. 1, Bidding Procedures, II.  Moreover, as exemplified by the Stalking Horse APA's closing

7199122

to three (3) Business Days to serve the Bidding Procedures Order by first-class mail upon interested parties (including "all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Acquired Assets during the past 6 months"), <u>which means, given an intervening weekend, that potential competing bidders may not even receive a copy of the Bidding Procedures Order until after the Bid Deadline</u>. *See* Motion, ¶¶11, 28.  As this Court is well aware, the filing of these bankruptcy cases (and its resulting publicity), by itself alone could result in new or renewed interest.   Of significant mention too, the Stalking Horse APA proscribes solicitation of bids prior to entry of the Bidding Procedures Order:

> Until the time bids are due in accordance with the Bid Procedures Order or, if a competing bid is submitted, until the conclusion of the Auction, Seller is permitted to and to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by any Person (in addition to Buyer and its Affiliates and representatives) in connection with any Alternative Transaction; <u>provided, however, that until the date the Bankruptcy Court enters the Bid Procedures Order, Seller agrees that (a) it will not</u>, and it will cause its agents, representatives, professionals, advisors, attorneys, employees, directors, officers, stockholders, and Affiliates to not, <u>directly or indirectly, solicit or entertain offers from, negotiate with, or in any manner encourage, discuss, accept, or consider any proposal, agreements, or arrangements with any person or entity other than Buyers with respect to a possible sale, divestiture, or otherwise of any of the Acquired Assets of Seller</u> that could or would serve as a "stalking horse," compete with the transactions contemplated by this Agreement as the "stalking horse," potentially or actually replace the Buyer as the "stalking horse" for some or all of the Acquired Assets, or otherwise interfere with the transactions contemplated by this Agreement until the date the Bankruptcy Court enters the Bid Procedures Order and (b) a breach of this provision shall be deemed a material breach of a covenant giving Buyer the right to terminate the Agreement (without any right to cure), and the Deposit shall be returned to the Buyer as the sole and exclusive recourse in the event this Agreement is terminated pursuant to this provision; provided,

---

conditions, the licensing requirements here necessitate a longer sale timeline. *See, e.g.,* Stalking Horse APA, §9.3(e) (further describing that the Stalking Horse Bidder would begin the process to make appropriate filings with resident boards of pharmacy and otherwise apply for any such licenses or permits shortly after the Stalking Horse APA was executed).

7199122

further, that nothing shall prevent Seller from (a) entering into any confidentiality agreement or (b) providing access to information to any party that has entered into a confidentiality agreement. In addition, Seller shall have the authority to respond to any inquiries or offers with respect to an Alternative Transaction and perform any and all other acts related thereto to the extent any such act is not in violation of the Bid Procedures Order, the Bankruptcy Code or this Agreement.

Stalking Horse APA, § 6.1(a).  Accordingly, between the complete lack of disclosure on any pre-petition marketing and the Stalking Horse Bidder's prohibition on post-petition marketing, we have no marketing.

### E.  Credit Bid Rights Should Not Be Approved Absent Further Order Of The Court And Should Only Be Approved As To The Business Assets And Not The Litigation Claims.

41.  Section 363(k) of the Bankruptcy Code provides: "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, ***unless the court for cause orders otherwise*** the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. 363(k) (emphasis added).  Whether cause exists is a determination to be made on a case by case basis. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006) (limiting credit bid rights "for cause" is a flexible concept to be considered on a case-by-case basis).

42.  Courts have held that the furtherance of general bankruptcy goals, such as the desire to foster a competitive bidding environment, might constitute `cause' sufficient to limit credit bidding rights under subsection (k).  *See In re Fisker Automotive Holdings., Inc*., 510 B.R. 55 (Bankr. D. Del. 2014) (capping a secured creditor's right to credit bid where "to do otherwise would freeze bidding."); *In re Free Lance-Star Publishing Co*., 512 B.R. 798 (Bankr. E.D. Va. 2014) (capping a secured creditor's right to credit bid where the creditor lacked a lien on certain

22

of the debtors' assets, the creditor had engaged in inequitable conduct, and "limiting the amount of the credit bid . . . [would] restore enthusiasm for the sale and foster a robust bidding process"). "A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, at n.14 (3d Cir. 2010). Additionally, credit bidding should not be allowed when it would chill bidding and threaten notions of fairness in the bankruptcy process. *See id.*

43.    Courts have also denied credit bids for cause where there is inequitable conduct harming the debtor or its estate. *See In re Aloha Airlines, Inc.,* 2009 WL 1371950 (Bankr. D. Hawaii 2009) (denying right to credit bid where creditor struck a prior business deal relating to the debtor's assets with a competitor of the debtor and engaged in inequitable conduct harming the debtor); *In re The Free-Lance Star Publishing Co.,* 2014 WL 2505627 at *7 (Bankr. E.D. Va. 2014) (denying secured lender the right to credit bid because it leveraged its position as a secured lender to acquire additional collateral prior to the bankruptcy filing for the purpose of purchasing assets with credit in a bankruptcy case); and *In re Theroux,* 169 B.R. 498 (Bankr. D.R.I. 1994) (denying credit bid where the sale price grossly undervalued the assets).

44.    Courts have also found cause to deny credit bidding when a sufficient dispute exists regarding the validity of the lien forming the basis for the credit bid.  *In re Fisker Automotive Holdings, Inc.,* 510 B.R. at 61  ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien."); *In re Daufuskie Island Properties, LLC,* 441 B.R. 60, 63-64 (Bankr. D.S.C. 2010) (denying secured creditor the right to credit bid because its mortgage and claim were subject to dispute). Only property in which the secured creditor holds a valid perfected security interest may be purchased by such creditor's

credit bid.  *In re The Free-Lance Star Publishing Co.,* 2014 WL 2505627 at *6 (Bankr. E.D. Va. 2014) (denying creditor the right to credit bid for assets in which it did not hold properly perfected security interests).   The Third Circuit has emphasized the import of "review by the creditors," equipped with "full information," in any prospective asset sale under § 363(b)(1). *See Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (noting that the "creditor body could suffer" if the review process is not fully informed). Unsurprisingly, there is "no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien." *Fisker Automotive*, 510 B.R. at 61.  Moreover, bids on unencumbered property must pay cash:

> If the creditor's lien reaches only some of the property to be sold, the creditor cannot credit bid the secured claim for the unencumbered property but must pay cash. How much the creditor must pay depends on the relative value of the encumbered and unencumbered property. A court might conclude that if the sale requires a complicated valuation process that could delay the sale, it should "order otherwise" and deny the right to credit bid, unless, for example, the valuation could take place after the sale and the secured creditor can provide adequate assurance that it will be able to pay the cash portion once the amount is determined.

Collier on Bankruptcy ¶ 363.09[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Finally, the right of a secured creditor to credit bid is defensively designed and intended to protect secured creditors from the sale of its collateral for an unreasonably low value.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070 at n.2 (2012).

45.     Here, both Prepetition TPC Lenders owed a purported $81 million, and the DIP Lender anticipated to be owed $8 million are permitted to submit credit bids, but only in support of the Stalking Horse Bid:

> The DIP Lender and the Prepetition TPC Lenders (as defined in the DIP Order) are affiliated with the Stalking Horse Bid. Notwithstanding anything to the contrary provided herein or in the Bidding Procedures, each of the Prepetition TPC Lenders and the DIP Lender, subject to section 363(k) of the Bankruptcy Code, may credit bid of all or any portion of the aggregate amount of

24

their respective secured claims (including, without limitation, either or both of their prepetition or postpetition secured claims) pursuant to section 363(k) of the Bankruptcy Code at any time during the Auction; provided, however, that other than in support of any Overbid, any credit bid submitted by the Prepetition TPC Lenders and the DIP Lender shall only be used to enhance the value the Stalking Horse Bid, and such credit bid, unless in support of any Overbid, shall not be made by the Prepetition TPC Lenders and the DIP Lender on behalf of any other bids for their own benefit or the bid of any other party other than the Stalking Horse Bidder; provided further that any improved Stalking Horse Bid pursuant to any such credit bid must continue to comply in all respects with the requirements for Qualified Bids as set forth in the Bidding Procedures. Notwithstanding anything herein to the contrary, the DIP Lender and/or Prepetition TPC Lenders (or any affiliates thereof) may not exercise their credit bid rights, whether under section 363(k) of the Bankruptcy Code or otherwise, without having received the prior written consent of the Prepetition Senior Lender (such consent to not be unreasonably withheld, conditioned, or delayed).

Bidding Procedures Order, ¶ 17. Permitting credit bidding in this context would not serve the defensive purpose and policy underlying credit bidding, but rather provide a sword in which the Stalking Horse Bidder can extract assets from a Debtors' estate without providing any value in return.  Additionally, the amount, nature, extent, validity and perfection of the purported secured claims of the DIP Lender and the Prepetition TPC Lenders is not yet determined—and the Committee's current investigation period does not expire until February 20, 2022 (*see* Interim DIP Order, ¶34).  Sufficient cause exists to deny the proposed credit bid rights because the credit bidding rights are being proposed as a sword and not a shield, there is a potential dispute regarding the validity and existence of any purported secured claim, an investigation has not occurred, the relationship between DIP Lender, Prepetition TPC Lenders and the Stalking Horse Bidder has not been fully disclosed, the bid relates to presently unencumbered assets, which should require cash payment, and permitting a credit bid threatens notions of fairness in the bankruptcy process whereas denying credit bidding here will foster a competitive bidding

7199122

environment that could result in cash for the estates.   For these reasons, no credit bidding should

be permitted absent further order of the Court.[15]

### F.   The Bid Protections Are Unwarranted.

46.    Bid protections in bankruptcy cases are not presumptively valid. *See In re O'Brien

Env't'l Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).   Break-up fees and expenses are only

appropriate where there is evidence that "the fees were actually necessary to preserve the value

of the estate." *See id*. at 535.; *In re Reliant Energy Channelview LP*, 403 B.R. 308, 311 (D. Del.

2009), aff'd, 594 F.3d 200, 210 (3d Cir. 2010).   Here, the collective bid protections afforded to

the Stalking Horse Bidder (which is affiliated with the Prepetition TPC Lenders and the DIP

Lender), are in excess of $1.2 million, comprised of a minimum $450,000 Break Up Fee, an

Expense Reimbursement up to $500,000,[16] and an additional $250,000 overbid amount

(collectively totaling 6.5% of purported $18.5 million Stalking Horse Bid)—such amounts

should be reduced and should not be entitled to super-priority administrative expense claim

status, or used as a credit bid.

### G.   There Should Be No Finding Of Good Faith.

47.    Section 363(m) of the Bankruptcy Code provides that a sale to a "good faith"

purchaser authorized under section 363(b) or (c) of the Bankruptcy Code cannot be reversed or

---

[15] To the extent credit bid rights are approved, any such credit bid should apply to only the Debtors' Business Assets and not the Litigation Claims.  Even if the DIP Lender is allowed to credit bid any portion of claims based on the DIP Facility, it should not be permitted a credit bid up to the full amount of the anticipated DIP Facility given that it is unclear how much of the proposed DIP Facility will actually be used.  Additionally, the Committee's ability to object to any credit bid should be preserved, with an express statement that the alleged liens and security interests are not *ipso facto* found valid by the entry of the Bidding Procedures Order, and any credit bidders should be required to provide some form of protection to the estates, such as a letter of credit, to prevent a back-door release of potentially valuable estate claims. *See, e.g., In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (bank allowed to credit bid conditioned upon the posting of an irrevocable letter of credit to protect the estate in the event the liens were later avoided).

[16] In addition to the total bid protection package being over market, the expense reimbursement is also chilling in its own right because it signals to other bidders the potential cost of due diligence. Additionally, these bid protections, including the Overbid requirement, should be adjusted so as to permit flexibility to determine "otherwise better" bids that are not necessarily "higher" than the Stalking Horse Bid, including, for example, bids that exclude certain of the assets, such as the Litigation Claims.

7199122

modified on appeal, unless such sale was stayed pending appeal:

> (m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). A finding of good faith is also required for any sale under the substantive law of the Third Circuit. *Abbotts Dairies*, 788 F.2d at 149–50 ("[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser."). A court may not find good faith if fraud, collusion or unfair advantages are determined. *Id.* at 147.

48. Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *Abbotts Dairies*, 788 F.2d at 147 (holding that section 363(m) "encompasses one who purchases in 'good faith' and for 'value'" under traditional equitable principles). In determining whether an asset purchaser is entitled to such protections, courts examine "the integrity of his conduct in the course of the sale proceedings." *Abbotts Dairies*, 788 F.2d at 148. In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee. *See Abbotts Dairies*, 788 F.2d at 147-48. Currently, the proposed form of Bidding Procedures Order includes a finding that "the Bidding Procedures and the Stalking Horse Agreement were each negotiated among the Debtors and the Stalking Horse Bidder the [*sic*] parties at arms'-length and in good faith." *See* Bidding Procedures Order, at F. For the reasons already discussed herein, any "good faith" finding with

27

respect to the Stalking Horse Bidder or any acquisition of the Debtors' assets by the Stalking Horse Bidder should not be made at this time.

### H.   There Should Be No Waiver of Bankruptcy Rules 6004(h) and 6006(d).

49.     The Debtors seek a waiver of any waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) of the effectiveness of the Bidding Procedures Order, and any Sale Order, as well as any other separate order authorizing the assumption or assumption and assignment of any assumed contract in connection with the Sale.  *See* Motion, ¶81.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

50.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented. Fed R. Bankr. P. 6004(d) advisory committee's note.  The stay pursuant to Bankruptcy Rule 6004(h) may be waived to allow a sale to close immediately "where there has been no objection to the procedure." Collier on Bankruptcy ¶ 6004.11 (16th ed. 2016).  Courts may waive the stays under rules 6004 and 6006 upon an "evidentiary showing of a business exigency requiring a closing within 10 days of an approval order . . . ." *In re PSINet, Inc.,* 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (decided under the pre-revision rules providing for a ten day stay period).

51.     Here, the Debtors have made no showing of any business exigency constituting cause to waive the fourteen day stay period.  To the contrary, waiving such period could

seriously prejudice the Debtors' other creditors, as it could allow a sale to close prior to any reasonable investigation of the assets being sold, and prior to the end of any appeal period.[17] Since no exigency exists, the fourteen day stays under Rules 6004(h) and 6006(d) should not be waived.

## I.     **Additional Procedures Are Objectionable**.

52.     In addition to the issues raised above, there are additional procedures that will need to be modified to maximize value and transparency.  These include, but are not limited to, the following requests:

    a.  Eliminate the requirement that prospective bidders provide proof of financial wherewithal before receiving access to the data room and due diligence information; rather, the only requirement for access should be a signed confidentiality agreement, which should be acceptable to the Debtors, in consultation with the Committee—accordingly, the participation requirements (i.e., Preliminary Bid Documents) and the determination of the Acceptable Bidder should be modified and include consultation with the Committee.  *See* Bidding Procedures Order, Ex. 1, Bidding Procedures, II.

    b.  Due diligence should not expire at the Bid Deadline, but should rather be extended through the Auction, and the deadline for objections to Sale should be extended from the Bid Deadline to a date after the Auction.  Motion, ¶11.

    c.  Expressly permit a sale of lots and consideration of partial bids. Moreover, component bids should not be excluded solely because the combination of all component bids does not exceed the Stalking Horse Bid—flexibility and inclusion

---

[17] The Stalking Horse APA provides an "Outside Date" for closing of February 3, 2023 (See Motion, at Ex. B, Stalking Horse APA, §10.1(c)), which is prior to the Committee's investigation period that expires on February 20, 2022 (*see* Interim DIP Order, ¶34).

should be the rule – not gating and exclusion.

d.  Require that the Debtors shall provide access or promptly deliver to the Committee copies of any materials provided to or by Potential Bidders in connection with the sale process, including, promptly upon receipt, all draft term sheets and other documentation in connection with any Sale transaction;

e.  The Debtors should be required to consult with the Consultation Parties (including the Committee) on certain decisions now reserved for the Debtors only (or for the Debtors' "discretion" or "business judgment") including with respect to additional information and due diligence access (or withholding/redaction), any bidding or sale determination, such as consideration of proposals for less than substantially all the Assets, the ability to discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder, the highest or best Qualified Bid(s), minimum Overbid increments, Overbid alterations, Backup Bidders, the determination of Backup Bidders as Successful Bid, all of which should not be made by the Debtors alone, but should be made in consultation with the Committee. *See* Bidding Procedures Order, Ex. 1, Bidding Procedures, II, II(b), III, V, V(b), VI(a)&(c).

f.  The Committee's professionals should receive copies of all bids and TPC's counsel (McDermott, Will & Emery) should not receive same in light of TPC's affiliation with the Stalking Horse Bidder. *See* Bidding Procedures Order, Ex. 1, Bidding Procedures, I.

g.  The Debtors, in consultation with the Committee, should be permitted to modify <u>*all*</u> Bid Requirements, including the minimum Purchase Price, which is presently

the only one of the Bid Requirements excluded from such modification, as well as the terms of the Overbid.  *See* Bidding Procedures Order, Ex. 1, Bidding Procedures, II & V(b).

h.  The 10% deposit should be required for all bidders, including the Stalking Horse Bidder (which deposit of only $1 million is, at best, only 5.4% of the adjustable purchase price) and any credit bidders, and it should further be limited to the cash consideration given that non-cash consideration may not be determined in light of, *inter alia*, the assumption procedures. *See* Bidding Procedures Order, Ex. 1, Bidding Procedures, II(e).

i.  Acceptance of the Successful Bid and determination of the Backup Bidder should not be "subject to the rights of the Stalking Horse Bidder, if any, to terminate the Stalking Horse Agreement in accordance with the terms thereof." *See* Bidding Procedures Order, Ex. 1, Bidding Procedures, V(d), VI(a)&(c).  Similarly, the provisions that "the Stalking Horse Bidder shall have no obligation to be the Backup Bidder and shall retain all rights to terminate the Stalking Horse Agreement on the terms therein" should be deleted. *See* Bidding Procedures Order, Ex. 1, Bidding Procedures, VI(a).

j.  Eliminate the provision that "[f]or the avoidance of doubt, any exercise of fiduciary duties that is materially inconsistent with these Bidding Procedures shall be subject to approval by the Court." *See* Bidding Procedures Order, Ex. 1, Bidding Procedures at XIII.

k.  The term "Consultation Parties" is presently defined to mean "(a) Silicon Valley Bank; (b) TriplePoint Capital LLC; and (c) the Committee, provided that if any

party that either (i) submits a Bid to purchase the Assets, or (ii) submits a credit

bid set forth in Article IV of these Bidding Procedures," but TriplePoint Capital

LLC should be excluded as such party insofar as it is affiliated with the Stalking

Horse Bidder (in a manner that has yet to be clearly defined).  *See* Bidding

Procedures Order, Ex. 1, Bidding Procedures at VII.

l.    With respect to the Assumption and Assignment Procedures:

  (i)    The Schedule of Potential Assumed Contracts attached to the Cure

         Notice is not yet completed and it is unclear exactly when it will be

         filed and served.[18] Accordingly, utilizing the January 13, 2023 date

         certain as the deadline for counterparties to file objections to Cure

         Notice (aka, the Potential Assumption and Assignment Notice for

         Potential Assumed Contracts) is inappropriate and should instead be

         the later of January 13, 2023 or a minimum of at least ten (10)

         calendar days after the date of service of the Cure Notice. Motion,

         ¶11.

  (ii)   Additionally, the deadline for objections to any Supplemental

         Assumption and Assignment Notice is not clear in the Cure Notice

         and should be updated to reflect the deadline described in the

         Motion, which is "no later than ten (10) calendar days after the date

         of service of such Supplemental Assumption and Assignment

         Notice."  Motion, ¶37.

---

[18] The Stalking Horse APA requires that the Cure Notice be filed ten (10) calendar days after the December 9, 2022 effective date, but no such filing appears to have been made. Stalking Horse APA 1.5(b).  However, the deadline for the filing of the "Potential Assumption and Assignment Notice for Potential Assumed Contracts" is described in the Motion as "on or before two (2) Business Days after entry of Bidding Procedures Order."  Motion, ¶11.

7199122

      (iii)      There is insufficient time for any Post-Auction Objection—which per the terms of the Cure Notice, must be made at the Sale Hearing scheduled to occur on January 19, 2023, only two (2) days after the January 17, 2023 Auction.[19]

      (iv)      All undisputed portions of cure amounts should be required to be paid.

m. The cap on the Stalking Horse Bidder's liability for its breach of the Stalking Horse APA to its good faith deposit and "Reverse Break-Up Fee" comprised of a $1 million reduction in the Prepetition TPC Lenders' secured claims should be eliminated.  Stalking Horse APA § 10.1(d)&(f).

n. Remove the termination right arising from (i) a failure to close by the "Outside Date" February 3, 2023 (*id*. at §10.1(c)), (ii) Cure Amounts owing with respect to Previously Omitted Contracts Buyer wishes to designate as Assumed Contracts exceeding $250,000 (*id*. at §10.1(f)), (iii) Buyer not being deemed the Successful Bidder at the Auction (*id*. at §10.1(h)), and (iv) if Buyer timely rejects the various Schedules to the Stalking Horse APA (*id*. at §10.1(m)).

53.      In sum, the Committee appreciates the need for an expedited sale process that minimizes expenses, but the proposed break-neck pace sought by the Debtors is simply too aggressive, particularly given the lack of information (and the little we know about the prepetition activities), the affiliation of the key parties here, and the nature purported assets to be sold.  Accordingly, in order for the sale process to achieve the desired goal of maximizing value,

---

[19] Indeed, service of the "notice of successful bidder" is unlikely to even reach the counterparties in time for them to file an objection.

7199122

the entire sale process[20] should be extended by at least six (6) weeks and the other modifications

requested herein should be made.

[remainder of page intentionally]

---

[20] All dates must be extended, including the "Outside Date" of February 3, 2023 that is described in the Stalking Horse APA, §10.1(c).

7199122

## CONCLUSION

WHEREFORE, for the reasons stated above, the Committee respectfully requests that the Court (i) adjourn the Motion out two (2) weeks through January 17, 2022, (ii) deny the Motion in its entirety, or (iii) grant the Motion, but only if the modifications requested herein are made, including, but not limited to, an extension of the relevant sale timeline by six (6) weeks, and grant such other and further relief as this Court deems just and proper.

Dated: January 2, 2023

_/ s/ Cheryl A. Santaniello_____
Cheryl A. Santaniello, Esq. (DE Bar No. 5062)
Porzio, Bromberg & Newman, P.C.
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone:  (302) 526-1235
Facsimile:  (302) 416-6064
E-mail: casantaniello@pbnlaw.com
Warren J. Martin Jr., Esq. (*pro hac vice*)
Robert M. Schechter, Esq. (*pro hac vice*)
Kelly D. Curtin, Esq. *(pro hac vice)*
David E. Sklar, Esq. (*pro hac vice*)
Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
P.O. Box. 1997
Morristown, New Jersey 07962
Telephone: (973) 538-4006
Facsimile: (973) 538-5146
Email: wjmartin@pbnlaw.com
Email: rmschechter@pbnlaw.com
Email: kdcurtin@pbnlaw.com
Email: desklar@pbnlaw.com
*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

7199122