## **EXHIBIT B**

**Reply**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MEDLY HEALTH INC., *et al.*,[1] | ) | Case No. 22-11257 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 15, 71, 124,** |
| | ) | **131, and 132** |

## OMNIBUS REPLY IN SUPPORT OF DEBTORS' BID PROCEDURES MOTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

submit this omnibus reply (the "Reply") in support of the Combined Sale/Bid Procedures Motion[2]

and in response to the following objections: (a) the Office of the United States Trustee ("UST")

[Docket No. 124] (the "UST Objection"); (b) certain landlords (the "Landlords") [Docket No.

131]; and (c) the Official Committee of Unsecured Creditors (the "Committee") [Docket No. 132]

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Medly Health Inc. (3391); Care Well Pharmacy, Inc. (9048); Grubbs Care Pharmacy NW Inc. (0490); Marg Pharmacy, Inc. (5838); Medly Atlanta Inc. (7312); Medly Baltimore Inc. (2354); Medly Bedford Ave Pharmacy Inc. (3690); Medly Bristol Inc. (4556); Medly Bronx Inc. (4741); Medly Chicago Inc. (5231); Medly Dallas Inc. (7581); Medly DC Inc. (9403); Medly Enterprise LLC (8898); Medly Grand Central Inc. (1741); Medly Houston Inc. (7443); Medly Jersey City Inc. (5677); Medly Mail Service Pharmacy LLC (9203); Medly Miami Inc. (8101); Medly Orlando Inc. (7581); Medly Pharmacy Inc. (4606); Medly Pharmacy PA Inc. (8494); Medly Pittsburgh Inc. (8381); Medly Queens Inc. (9623); Medly Raleigh Inc. (5140); Medly San Antonio Inc. (9973); Medly Stamford Inc. (4966); Medly Tampa Inc. (5128); Medly UCHC Pharmacy Inc. (6672); Medly Utah Inc. (4648); Pharmaca Integrative Pharmacy, Inc. (0334); Tango340B LLC (4781); and West Campbell Pharmacy Inc. (2931). The Debtors' business address is 7088 Winchester Circle, Suite 100, Boulder CO 80301.

[2] *Motion of the Debtors for Entry of Orders: (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into Stalking Horse Agreement and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling A Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 15] (the "Combined Sale/Bid Procedures Motion"). Capitalized terms not defined herein shall have the meanings set forth in the Combined Sale/Bid Procedures Motion.

(collectively, the "Objections").  In response to the Objections and in further support of the Combined Sale/Bid Procedures Motion, the Debtors respectfully state as follows:[3]

## Preliminary Statement

1.      The Debtors filed these chapter 11 cases with the unfortunate reality that, absent the Stalking Horse Agreement and the funding provided under the Debtors' DIP financing with its sale-related milestones, the Debtors likely would not have the ability to complete *any* going concern sale process.  Without the Stalking Horse Agreement, the jobs of hundreds of the Debtors' employees would be jeopardized, patients and doctors would be left without a trusted pharmacy partner in Pharmaca, and the value available to the Debtors' stakeholders from these estates would be substantially reduced.

2.      Under the proposed Stalking Horse Agreement, the Debtors stand to recover $18.5 million in cash (notably, not in the form of a credit bid) to, among other things, repay the DIP financing, satisfy wind-down and administrative expenses, and make distributions to prepetition stakeholders in accordance with applicable priorities.  Absent approval of the proposed Bidding Procedures and subsequently the Stalking Horse Agreement, the Debtors will have no certainty as to their ability to complete a sale that maximizes the value of these estates.  As a result, the Debtors submit that the Stalking Horse Agreement and the sale process proposed under the Bidding Procedures represent a sound exercise of the Debtors' business judgment under the circumstances.

3.      The Debtors address each of the Objections below:

---

[3] At the January 3, 2023 hearing, the Debtors will be presenting live witness testimony from Richard Willis in support of the Bidding Procedure relief requested.

### Omnibus Reply

**A.    UST Objection**

4.    The UST Objection makes two arguments.  First, the Bid Protections (break-up fee of $450,000 and expense reimbursement of up to $500,000) are not necessary and do not benefit the estates because the Stalking Horse Bidder is an affiliate of the DIP Lender and Prepetition TPC Lenders.  Second, the timeline for the sale process -- with an original proposed bid deadline eleven (11) days after the bid procedures hearing -- has not been justified because the Debtors have not adequately described their prepetition and postpetition marketing process.  The current proposal is actually fourteen (14) days until the bid deadline of January 17, 2023, with a sale hearing on January 24, 2023.

5.    The Court should overrule the UST Objection.  As explained below, the Bid Protections are necessary and benefit the estates.  The Stalking Horse Bidder was only willing to make a stalking horse bid with the proposed Bid Protections in place, and there are no other bidders that have come forward to bid on the assets without any bid protections.  In addition, the Debtors' prepetition and postpetition marketing process was adequate under the circumstances.

**The Bid Protections for the Stalking Horse Bidder are Necessary and Benefit the Estates**

6.    The Stalking Horse Agreement proposes to sell the Acquired Assets to the Stalking Horse Bidder, subject to higher and better bids, in consideration of payment to the Debtors of $18.5 million as the Base Purchase Price subject to adjustments as set forth in section 2.1(a) of the Stalking Horse Agreement.

7.    The Bid Protections for the benefit of the Stalking Horse Bidder requested in the Stalking Horse Agreement -- *i.e.*, a $450,000 break-up fee and an expense reimbursement not to exceed $500,000 -- are reasonable and well within the scope of the bidding protections typically

3

approved by courts in this District.  *See* Bid Procedures Motion ¶ 51.  As explained in the Bid Procedures Motion, the Stalking Horse Bidder – MedPharmaca Holdings, Inc. – is affiliated with the DIP Lender and the Prepetition TPC Lenders, but there is also an independent third party involved, TerraMar Capital, LLC ("TerraMar").  The Debtors have no prior relationship to TerraMar.  The Stalking Horse Bidder is not itself a lender to the Debtors, nor is the Stalking Horse Bidder credit bidding under the Stalking Horse Agreement.  *See* Bid Procedures Motion ¶ 21.

8.      The Stalking Horse Bidder is not precluded, as the UST seems to suggest, from the benefit of Bid Protections just because it is affiliated with the DIP Lender and Prepetition TPC Lenders.  Further, as noted, the Stalking Horse Agreement does not involve any credit bid component – it contemplates a cash purchase price.  The Debtors needed to provide an incentive to the Stalking Horse Bidder in the form of the proposed Bid Protections in order to reach agreement on the proposed sale.  The Debtors currently have no other bidders intending to make a bid on the estates' assets without any bid protections.  The proposed Bid Protections therefore satisfy the test set forth in *In re Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), where the court held that bidding incentives must provide some benefit to the Debtors' estates.  *See id.* at 533.  The Debtors are getting the tangible benefit of a binding bid.  The Stalking Horse Bidder was unwilling to enter into the Stalking Horse Agreement or to set a floor of $18.5 million for the Base Purchase Price of the Acquired Assets without the Bid Protections, which represent reasonable buyer protections that were negotiated in good faith and at arms' length between the parties.

9.      By virtue of the fact that the DIP Lender and Prepetition TPC Lenders are affiliated with the Stalking Horse Bidder, the UST argues by extension that they are already obligated to bid and do not need the incentive of Bid Protections.  In fact, the lenders were under no obligation to

4

participate in a stalking horse bid.  As noted, a non-lender party, TerraMar, is also affiliated with the Stalking Horse Bidder and has no prior relationship with the Debtors.

10.    Even without TerraMar's participation, there is nothing novel about a lender affiliate participating in a stalking horse bid and this Court has approved bid protections for stalking horse affiliates of lenders in many other cases. *See, e.g.*, *In re Vesta Holdings, LLC*, Case No. 22-11019 (LSS) (Bankr. D. Del. Dec. 7, 2022) [Docket No. 158] (approving bid procedures and bid protections – expense reimbursement up to $1.5 million – for stalking horse bidder that was also affiliate of DIP lender and prepetition lenders); *In re NewAge, Inc*., Case No. 22-10819 (LSS) (Bankr. D. Del. Sept. 21, 2022) [Docket No. 105] (approving bid procedures and bid protections – breakup fee of 2.5% of purchase price and up to $375,000 expense reimbursement – for stalking horse bidder that was also serving as DIP lender); *In re Enjoy Technology, Inc*., Case No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022) [Docket No. 199] (approving bid procedures and bid protections -- break-up fee of $2,586,000 – for stalking horse bidder that was also serving as the DIP lender); *In re EYP Group Holdings, Inc.*, Case No. 22-10367 (MFW) (Bankr. D. Del. May 11, 2022) [Docket No. 81] (approving bid procedures and bid protections -- $2 million break-up fee and up to $900,000 expense reimbursement – for stalking horse bidder that was also both the DIP lender and prepetition lender, not even a separate affiliate).

11.    In addition, the fact that other qualified bidders are required to offer cash sufficient to cover the Bid Protections is not a novel concept in bid procedures in this district.  *See* UST Objection ¶ 15.  The presence of that bid requirement does not automatically create a chilling effect, and indeed it is quite common, if not standard, practice.  *See, e.g.*, *In re Vesta Holdings, LLC*, Case No. 22-11019 (LSS) (Bankr. D. Del. Dec. 7, 2022) [Docket No. 158] (see approved bid procedures at page 6 (section C.(c)(iv)), requiring overbids to "obligate the Bidder to pay . . . all

5

amounts that the Stalking Horse Bidder has agreed to pay under the Stalking Horse Agreement, including any Assumed Liabilities (as set forth in the Stalking Horse Agreement) and the Expense Reimbursement."); *In re NewAge, Inc.*, Case No. 22-10819 (LSS) (Bankr. D. Del. Sept. 21, 2022) [Docket No. 105] (see approved bid procedures at page 6 (section 5(xi), requiring qualified bids to propose purchase price "in an amount not less than the Stalking Horse Bid plus the Bid Protections plus the Minimum Overbid Amount."); *In re Enjoy Technology, Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022) [Docket No. 199] (see approved bid procedures at page 5 (section VI(a)(v)), requiring qualified bids to provide "aggregate consideration that is in an amount greater than the sum of the Purchase Price (as defined in the Stalking Horse Agreement), the Stalking Horse Bid Protections, and $2,000,000."); *In re EYP Group Holdings, Inc.*, Case No. 22-10367 (MFW) (Bankr. D. Del. May 11, 2022) [Docket No. 81] (see approved bid procedures at page 7 (section II.d.), requiring bids to have "sufficient cash consideration specifically designated for the payment of the Prepetition Secured Obligations, DIP Obligations, Bid Protections and Minimum Initial Overbid in cash in full at closing.").

**The Prepetition and Postpetition Marketing Process Have Been Sufficient in These Circumstances**

12.     The Debtors have engaged in an adequate marketing process to justify the proposed sale timeline under the Bid Procedures.  As discussed in the First Day Declaration and in the Motion, the Debtors faced severe liquidity and operational challenges in the summer and fall of 2022.  At that time, the Debtors began a process to determine if there was any interest in a potential sale of the Debtors' business.  These prepetition marketing efforts included the following:

a.     In September 2022, the Debtors sought to engage an investment banker to consider options to raise money or restructure the company, whether through a sale, loan, or equity capital.   The Debtors contacted at least six (6) different investment bankers for a potential engagement, but no investment banker was willing to take the engagement at that time due to,

6

among other issues, the accounting irregularities discovered at the company in August 2022, the steep negative cash flow faced by the company, and limited time to evaluate the success of the company's new business plan.

b.  At this same time, the Debtors prepared a brochure for an "entire business" transaction (including both Medly and Pharmaca business lines) and created a data room with certain diligence materials for potential buyers, lenders, or investors. The Debtors contacted approximately twenty (20) potential financial and strategic parties that may interested in pursuing a transaction, including some of the largest pharmacies in the country. A number of non-disclosure agreements were signed with potential buyers (at least fifteen (15)) and approximate 5-6 buyers were granted access to the dataroom. About a dozen buyers also received the marketing brochure referenced above.

c.  The Debtors continued their marketing efforts from September through November 2022. Although at least two potential buyers expressed interest in a transaction and some preliminary values were discussed, ultimately, the Debtors did not receive any actionable proposals from potential buyers at that time. The Debtors therefore began preparations for a possible chapter 7 bankruptcy filing.

d.  In late November 2022, however, TPC approached the Debtors about the possibility of funding a chapter 11 sale process with a couple potential parties. The Debtors reached out to such parties and provided information. Ultimately, only TerraMar, in conjunction with TPC, expressed an interest in purchasing only the Pharmaca assets. The parties then spent the Thanksgiving holiday and subsequent days urgently negotiating the terms of an asset purchase agreement and debtor-in-possession financing agreement.

e.  In order to obtain sufficient bridge financing to negotiate the sale, on November 30, 2022, the Debtors obtained an additional $1 million loan advance from the Prepetition TPC Lenders, as set forth in the First Day Declaration.

f.  On December 9, 2022, the Debtors entered into the Stalking Horse Agreement with the Stalking Horse Bidder, who is affiliated with the DIP Lender and the Prepetition TPC Lenders, but does not serve as a lender to the Debtors. The Stalking Horse Agreement seeks to sell the Acquired Assets to the Stalking Horse Bidder, subject to higher and better bids, in consideration of payment to the Debtors of $18.5 million as the Base Purchase Price subject to adjustments as set forth in section 2.1(a) of the Stalking Horse Agreement.

13.     Since the Petition Date, the Debtors have established a separate data room with diligence materials focused solely on selling the Pharmaca business.  The Debtors have contacted approximately twenty (20) potential buyers for the Pharmaca business, including the largest pharmacy chains across the country and have responded to broker inquiries that could assist in locating potential buyers.   Postpetition, the Debtors have signed approximately five (5) nondisclosure agreements with potential buyers and provided those parties with access to the data room.  The Debtors have received preliminary indications that certain of these buyers may be interested in potentially submitting a competing bid for the Acquired Assets.

14.     The Debtors have pursued, and will continue to pursue, interest from any and all suitable potential buyers of the Pharmaca assets consistent with the proposed Bidding Procedures.

15.     The Debtors submit that the proposed marketing process is adequate in the circumstances of these chapter 11 cases.  The timelines under the Bid Procedures are also appropriate.   Importantly, the Debtors do not have the financial wherewithal to extend the applicable deadlines under the Bidding Procedures.  In particular, since the Petition Date, the Debtors are facing a $3 million shortfall in their DIP budget tied to a projected sale of prescription files for the remaining Medly locations.  The Debtors have been unable to find a buyer for those assets.   Accordingly, the Debtors do not have the luxury to materially extend the sale process beyond that contemplated by the proposed Bidding Procedures.

16.     Finally, the current fourteen (14) day proposed timeline from entry of the bid procedures order and the bid deadline is not unique in this district.  *See, e.g*., Motion ¶ 44 (citing the following examples: *In re Mabvax Therapeutics Holdings, Inc*., Case No. 19-10603 (CSS) [Docket No. 78] (Bankr. D. Del. Apr. 8, 2019) (approving bidding procedures with a bid deadline 18 days after entry of bidding procedures order); *In re Things Remembered, Inc.*, Case No. 19-

10248 (CSS) [Docket No. 100] (Bankr. D. Del. Mar. 13, 2019) (approving bidding procedures

with bid deadline 7 days after entry of order and auction scheduled for 26 days after entry of order);

*In re Charlotte Russe Holding, Inc.*, Case No. 19-10210 (LSS) [Docket No. 199] (Bankr. D. Del.

Feb. 21, 2019) (approving bidding procedures with bid deadline 10 days after entry of order and

auction scheduled for 29 days after entry of order); *In re Maurice Sporting Goods, Inc.*, Case No.

17-12481 (CSS) [Docket No. 125] (Bankr. D. Del. Dec. 12, 2017) (entering bidding procedures

order 22 days after petition date, approving bid deadline 10 days after entry of order); *In re*

*Golfsmith Int'l Holdings, Inc.*, Case No. 16-12033 (LSS) [Docket No. 196] (Bankr. D. Del. Oct.

6, 2016) (approving bidding procedures with a bid deadline 11 days after entry of order and auction

scheduled for 13 days after entry of order)).

17.    The Debtors are working under an extremely tight DIP budget and do not have

sufficient funding to extend the sale process for multiple weeks.  More time would be ideal, but

the Debtors' projected cash burn will not allow it.  There is no formulaic approach to sale processes

in chapter 11 cases—each case must be evaluated on its own facts.  In the circumstances of these

chapter 11 cases, and in light of the Debtors' liquidity and operational constraints, the Debtors

submit that the marketing process to date has been sufficient and the proposed sale process timeline

under the Bid Procedures is appropriate.

**B.**    **Landlord Objection**

18.    The Debtors also received an objection (the "Landlord Objection") jointly filed by

two (2) of the Debtors' landlords, Bel Aire Plaza, LLC and Deutsche Asset & Wealth Management

(together, the "Landlords").   As noted in the Landlord Objection, the Debtors engaged in informal

discussions with Landlords' counsel to address the objections to the Motion raised by the

Landlords.  Attached to this Reply as **Exhibit A** is a chart that summarizes the Landlords'

objections articulated in these discussions and set forth in the Landlord Objection, and whether or not such objections are currently resolved or unresolved.

## C.    **Committee Objection**

19.    The last objection to the Bidding Procedures was filed by the Committee.  The Committee takes a "kitchen sink" approach to the Bidding Procedures, raising many objections which are sale objections, not procedures objections, and previewing some of its DIP financing objections that are not set for hearing until January 9, 2023.  Given the number of issues raised by the Committee, the Debtors prepared a chart attached to this Reply as **Exhibit B** that summarizes the Committee's principal objections and the Debtors' responses thereto.

20.    The Debtors are prepared to implement a sale process that is appropriately tailored to the circumstances of these chapter 11 cases and designed to elicit the highest and best bid for their Pharmaca assets, while recognizing the expedited timeframe in which the Debtors need to close a sale given the Debtors' severe liquidity and operational challenges.  These objectives serve the ultimate end of any appropriate set of bidding procedures—to maximize value to the Debtors' stakeholders.  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 659–60 (S.D.N.Y. 1992) (describing the debtors' "duty to maximize value" when designing and administering a bidding process).

21.    The Committee seeks to extend the sale process by six (6) weeks, without taking into account the limitations of the Debtors' budget.  There is also no basis and no funding available for the Committee's request to adjourn the bid procedures hearing to an unspecified future date.  For the reasons set forth earlier in this Reply, the proposed sale timeline is justified by the extent of the Debtors' prepetition and postpetition marketing efforts to date and the tight DIP Milestones and budget under which the Debtors must proceed.  The proposed Bidding Procedures, as revised,

10

are accordingly tailored to this reality and are designed to build upon the prepetition marketing process that the Debtors have been pursuing for the last several months, while accounting for the unique and difficult circumstances of these chapter 11 cases.

22.     The Committee focuses heavily on the lack of prepetition marketing, but the Committee fails to fully appreciate the reality of what the Debtors face, instead of pushing wishful alternative paths that are not feasible.  Although more money, more time, and more help would be ideal, the Debtors do not have that luxury.  Before the Petition Date, the Debtors made all efforts to market their assets for sale by reaching out to the most likely viable buyers.  After the Debtors did not receive any actionable interest from potential buyers, they began preparing for a possible chapter 7 bankruptcy filing.   However, that changed around Thanksgiving Day when the TPC informed the Debtors of possibly funding a chapter 11 sale process.  The Debtors subsequently obtained $1 million in additional prepetition bridge financing from the Prepetition TPC Lenders in order to negotiate a potential sale through a chapter 11 process.

23.     Postpetition, the Debtors have continued with their marketing efforts, as explained herein.  However, the Debtors are now facing even more liquidity pressure given an unexpected $3 million budget shortfall from the lack of buyers for their prescription files at the Medly pharmacy locations.  The Debtors do not have the money to survive until a closing if the sale process is extended for six (6) weeks as the Committee suggests or any material length of time.

24.     For the additional reasons set forth in the chart attached hereto as **Exhibit B**, the Committee's Objection and request for adjournment of the Combined Sale/Bid Procedures Motion should be overruled.

11

## Conclusion

Based on the foregoing, the Debtors request that the Court overrule the Objections and enter an order approving the Bid Procedures Motion.

Dated:   January 2, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email: ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            tcairns@pszjlaw.com

Proposed Counsel to the Debtors and Debtors in Possession

# EXHIBIT A

Chart of Landlord Objections

| Landlords' Objection | Debtors' Response |
|---|---|
| (1) The Bidding Procedures do not provide any deadline by which the Stalking Horse Bidder will provide Landlords with evidence of its adequate assurances of future performance. | ***Resolved***. The proposed Bidding Procedures have been revised to provide that the Stalking Horse Bidder will provide this information to Landlords' counsel no later than January 5, 2023. |
| (2) The Bidding Procedures do not provide Landlords with sufficient time to review information on adequate assurances of future performance provided by competing Bidders. | ***Resolved***. The Bidding Procedures have been amended (i) to require the Debtors to promptly transmit evidence of competing bidder's adequate assurance of future performance to Landlords' counsel, but in any event, no later than 24 hours after the Bid Deadline; and (ii) competing Bidders are deemed to consent to the transmission of such information to Landlords' counsel. |
| (3) The Bidding Procedures do not provide that the Auction will be open for all creditors. Landlords' counsel had indicated that it wants to attend the Auction to ascertain the identity of the Successful Bidder and any Backup Bidder. | ***Resolved***.  The Bidding Procedures have been amended to provide that any party who wishes to attend the Auction (other than the parties identified in the Bidding Procedures and other parties that the Debtors deem appropriate who are already permitted to attend) will notify the Debtors by email at least five (5) days prior to the Auction of their intention to physically attend the Auction. |
| (4) The Bidding Procedures do not provide a deadline for the Debtors to file a notice of Auction results. | ***Resolved***.  The Bidding Procedures have been amended to provide that the Debtors will file their Notice of Auction Results within five (5) hours following the closing of the Auction. |
| (5) The proposed Bidding Procedures Order does not permit the Landlords to object to the assumption and assignment of leases to a Successful Bidder (other than the Stalking Horse Bidder) at the Sale Hearing. | ***Resolved***.  The proposed Bidding Procedures Order has been revised to clarify that parties may raise objections at the Sale Hearing to the assumption and assignment of Potential Assumed Contracts to the Successful Bidder (other than the Stalking Horse Bidder) on the grounds of adequate assurances of future performance. |
| (6) The Bidding Procedures do not specify the "type" of adequate assurance information required to satisfy landlords' counsel's concerns. | ***Unresolved.***  Landlords' objection requests a seven (7) bullet point non-exclusive checklist of evidence in order to satisfactorily demonstrate adequate assurances of future performance for the Landlords.<br><br>This list includes information that may not either exist or otherwise be applicable, depending on the identity of any proposed |

| | assignee, including: *inter alia* (i) audited financial statements for the past three (3) years; (ii) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, all cash flow projections for the leases subject to the assignment request, and any financial projections, calculations and/or pro-formas prepared in contemplation of purchasing the leases; and (iii) evidence of the potential assignee's retail experience and experience operating stores in a shopping center, among other requirements.<br><br>Without even knowing the bona fides of the Stalking Horse Bidder or any Backup Bidder, Landlords further demand either a security deposit, letter of credit or credit enhancement of at least four (4) months' rent and additional rent if the Landlords are not satisfied that the proposed assignee has sufficient operational history or experience or show appropriate financial resources pursuant to the Landlords' subjective requirements.<br><br>The Debtors are amenable to presenting potential Bidders with the Landlords' stated adequate assurance requirements in order to facilitate discussions on this issue in advance of the Sale Hearing. However, this information should not be binding or otherwise required by the Bidding Procedures Order. The Debtors submit that the Court will resolve any disputes over the type of evidence proffered to demonstrate adequate assurances of future performance (including, for example, whether or not any of the locations constitute "shopping center leases" under Bankruptcy Code section 365(b)(3)) in accordance with the Bankruptcy Code and applicable law governing the determination of adequate assurances of future performance, rather than strictly in accordance with the Landlords' subjective requirements. |
| (7) Objections to the Sale, including the assumption and assignment of leases to a | ***Unresolved.*** The Debtors do not believe this request is appropriate for several reasons: |

| | |
|---|---|
| Successful Bidder (other than the Stalking Horse Bidder) should be due until at least five (5) Business Days after: (a) the Successful Bidder has been identified; (b) the final form of asset purchase agreement and sale order has been filed; and (c) the Landlords have received adequate assurance from such Successful Bidder.  Otherwise, any Sale Hearing must serve only as a status conference with a substantive Sale Hearing to take place a future date.[1] | First, there is no reason at this juncture to pre-determine whether the Sale Hearing should be a status conference or substantive hearing. Pursuant to the Debtors' changes made to the Bidding Procedures summarized herein, the Landlords will have already obtained evidence of all potential Bidders' adequate assurance of future performance by the Bid Deadline (and by January 5, 2023 with respect to the Stalking Horse).  The Landlords will therefore have sufficient time to evaluate this evidence, communicate any alleged deficiencies and, if necessary, prepare and file any objection to either the Stalking Horse Bidder (which information they will have had since January 5th) or a Backup Bidder (which evidence they will have had by the Bid Deadline). Further, Landlords' counsel has indicated its intention to attend the Auction and will therefore know the identity of any Backup Bidder in real time following conclusion of the Auction.<br><br>Second, Landlords are not only objecting to the assumption and assignment of leases to a Backup Bidder, but also to the sale of the Acquired Assets to any Backup Bidder, no earlier than five (5) Business Days following the date the Landlords may have to object.<br><br>The Debtors do not want to chill bidding by *requiring* Backup Bidders to wait an additional five (5) Business Days from the date by which the Landlords object to consider both the proposed Sale and assumption and assignment of leases to a Backup Bidder.  Such a requirement may discourage parties from submitting bids because potential Bidders may not be willing to close any Sale around this uncertainty, including the Landlords' potential objection |

---

[1] It is unclear whether the Landlords are requesting a continuance of the entire Sale Hearing, even with respect to the Acquired Assets that do not implicate the Landlords' leases in the event of a Backup Bidder (*See* Landlords' Objection, ¶ 24) or only requesting a continued hearing with respect to the assumption and assignment of the Landlords' affected leases (Landlords' Objection, final sentence of ¶ 11).

| | of the Sale of the Acquired Assets to a Backup Bidder at a continued Sale Hearing separate and apart from the issue of the potential assumption and assignment of the Landlords' leases.<br><br>Third, it is entirely possible that the affected Landlords (after reviewing the evidence of adequate assurances of future performance and the identity of the Backup Bidder that they will now receive from competing Bidders in connection with their Bids) will not have any objection to the assumption and assignment of their leases.  It is also unknown whether any Backup Bidder will request the assumption and assignment of the two Landlords' leases pursuant to any Sale transaction.  The Landlords' request to pre-determine this issue at this juncture would foreclose the Court from approving the sale and the assumption and assignment of leases to the Backup Bidder at the Sale Hearing, even in a scenario where there is no objection to the assumption and assignment of leases to a Backup Bidder.<br><br>Finally, the Debtors have added language to the Bidding Procedures to clarify that all parties' rights to object to the assumption and assignment of leases to a party other than the Stalking Horse Bidder at the Sale Hearing are preserved.  Thus, nothing will prevent the Landlords from requesting a continuance of the Sale Hearing if and when this issue ever becomes ripe. |
|---|---|
| (8) Landlords have requested special bidding protections, including the ability to "credit bid" cure amounts and a waiver of any deposit requirements for non-cash bids | ***Unresolved.***  The Bidding Procedures provide:<br><br>"A Bid should propose a contemplated transaction involving all or substantially all of the Assets; *provided, however,* that the Debtors in their discretion (following consultation with the Consultation Parties), may consider proposals for less than substantially all the Assets so long as the economic value of such a proposal provides |

an economic value to the Debtors' estates that is greater than the Stalking Horse Bid, *provided further* that the Debtors will evaluate all Bids, in their sole discretion (following consultation with the Consultation Parties), to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole in light of any factors regarding such bid which the Debtors, in their discretion, determine are appropriate to be considered in evaluating Bids."

Thus, it is impossible to for the Debtors to determine right now whether a Landlord's potential one-off bid to acquire its own lease would maximize value to the Debtors' estates unless and until such bid can be evaluated along with and compared to the other competing Bids received by the Debtors. The Landlords' request for preferential treatment regarding the submission of Bids is similarly inappropriate because it would handicap the Debtors determination of the highest and best bid or combination of bids if the Landlords are permitted to "credit bid" cure amounts as a condition to that Bid. The Debtors submit a Landlord is free to submit bids for the acquisition of its applicable lease and such Bid will be evaluated in the Debtors' determination of the highest and best bid(s) received by the Bid Deadline for the acquisition of their Assets.

**EXHIBIT B**

Chart of Committee Objections

| Committee Objection | Debtors' Response |
|---|---|
| The Stalking Horse Bidder might be an insider, so heightened scrutiny applies to the sale.<br><br>UCC Objection ¶¶26-27. | This is a sale objection.  The Committee can raise any issues with respect to the appropriate standard to be used in connection with the sale hearing.   In any event, TPC and Terramar are not insiders of the Debtors.  TPC is solely a lender and Terramar has no prior relationship with the Debtors. |
| The Bidding Procedures are not fair because of the short timeline and the Bid Protections and the Sale could result in no recovery for unsecured creditors.<br><br>UCC Objection ¶¶28-29, 36-38. | The proposed sale timeline is not, as the Committee argues, a manufactured emergency.  The Debtors have limited funding under their DIP facility and are now facing a $3 million shortfall in their DIP budget tied to a projected sale of prescription files for the remaining Medly locations.  The Debtors have been unable to find a buyer for those assets.  Unfortunately, the Debtors' Pharmaca business cannot survive any material extensions of the sale process, and the Committee's proposed six (6) week extension is out of the question— the Debtors will run out of money well before that.<br><br>The standard for approval of bidding procedures is not whether it results in a recovery for unsecured creditors but whether there has been a proper exercise of sound business judgment under Bankruptcy Code section 363.  *See, e.g.*, *In re Scimeca Found., Inc.*, 497 B.R. 753, 771 (Bankr. E.D. Pa. 2013) ("The proper exercise of [sound business] judgment is shown when the purchase price is fair and reasonable and the sale process has been conducted in good faith by the trustee and by the prospective purchaser.") (citing, *e.g.*, *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 149–50 (3d Cir. 1986)). |
| The DIP budget supports additional time for a sale process because there are millions in DIP lender professional fees being paid.<br><br>UCC Objection ¶38. | This argument rings hollow because the bulk of the funds budgeted for DIP lender professionals are in the last week of the DIP budget and payable from proceeds of the proposed sale itself and not available from any other source. |
| The disclosure regarding the Litigation Claims is inadequate and the Litigation Claims should not be sold at this time. | The fact that the Litigation Claims are being sold is a sale issue, not a bidding procedures issue.  The Litigation Claims are part of what the Stalking Horse Bidder offered to buy, and the Stalking Horse |

| | |
|---|---|
| UCC Objection ¶¶30-35, 39 | Agreement represents the best price available for the assets. The Committee will continue to conduct its due diligence. If the Committee has an issue with Litigation Claims being sold, the Committee can object to the sale. The Debtors are only seeking approval at this time of the Bidding Procedures to conduct a sale process to maximize value. |
| The prepetition marketing was not adequate and the Stalking Horse Bidder has prohibited postpetition marketing.<br><br>UCC Objection ¶¶36-38, 40. | As explained in the Reply, the prepetition marketing was adequate under the circumstances.<br><br>Before Mr. Willis's January 1, 2023 deposition, the Debtors provided a copy of the interested parties list of potential buyers that were served with the Combined Sale/Bidding Procedures Motion and which were contacted prepetition by the Debtors during the prepetition marketing process.<br><br>As for the postpetition marketing process, the Debtors have a fiduciary duty to engage in postpetition marketing for a competitive sale process. Notwithstanding to the Committee's read of the Stalking Horse Agreement, postpetition the Debtors have contacted approximately twenty (20) potential buyers for the Pharmaca business, including major pharmacies across the country, and have responded to broker inquiries that could assist in locating potential buyers. The Debtors have also signed approximately five (5) nondisclosure agreements postpetition and provided those parties with access to the data room. The Debtors have received indications that certain third parties are interested in potentially submitting a bid for the Acquired Assets. |
| Credit bid rights should not be approved at this time.<br><br>UCC Objection ¶¶41-45. | The Committee can raise its objections to credit bidding in connection with any objection to the final DIP financing. In any event, this Court has frequently granted bid protections in cases involving a credit bid. *See In re Lucky Brand Dungarees, LLC*, Case No. 20-11768 (CSS) [D.I. 251] (Bankr. D. Del. July 30, 2020); *In re BL Restaurants Holding, LLC*, Case No. 20-10156 (MFW) [D.I. 227] (Bankr. D. Del. Feb. 27, 2020); *In re PGHC Holdings, Inc.*, Case No 18-12537 |

| | |
|---|---|
| | (MFW) [D.I. 150] (Bankr. D. Del. Nov. 30, 2018); *In re SynCardia Systems, Inc.*, Case No. 16- 11599 (MFW) [D.I. 175] (Bankr. D. Del. Aug. 5, 2016). |
| The Bid Protections are unwarranted because the Bid Protections in the aggregate are 6.5% of the purchase price and the Bid Protections should not be given superpriority status.<br><br>UCC Objection ¶46. | To start, the Committee lumps in the $250,000 overbid requirement as if the overbid is a recoverable monetary benefit that inures to the Stalking Horse Bidder.  Overbids ensure that potential buyers are serious and, thus, more likely to close on an alternative transaction.  Thus, the Bid Protections – the breakup fee and expense reimbursement – represent approximately 5% of the purchase price (not 6.5% suggested by the Committee).  This amount is well within the range of bid protections approved by courts in this district in other cases.  *See, e.g.*, *In re BHCosmetics Holdings, LLC*, Case No. 22-10050 (CSS) (Bankr. D. Del. Jan. 28, 2022) [Docket No. 90] (approving $172,000 breakup fee and expense reimbursement up to $150,000 in connection with $2.3 million sale, collectively equal to an amount up to 7.5% of the cash consideration of the stalking horse bid); *In re Valeritas Holdings, Inc.*, 20-10290 (LSS) (Bankr. D. Del. Mar. 6, 2020) (approving 3% break-up fee and $1 million expense reimbursement in connection with $23 million sale, totaling 7.3% of stalking horse bid); *In re Orexigen Therapeutics, Inc.*, Case No. 18-10518 (KG) [Docket No. 231] (Bankr. D. Del. April 23, 2018) (approving 5% break-up fee and expense reimbursement up to $2 million in connection with $75 million sale, equal to approximately 7.3% of the purchase price); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601(MFW) [Docket No. 190] (Bankr. D. Del. Apr. 6, 2018) (approving 3% break-up fee and up to 2% expense reimbursement equal to approximately 5% of the purchase price (or $15.5 million), in connection with $310 million sale); *In re ATopTech, Inc.*, Case No. 17-10111 (MFW) (Bankr. D. Del. Apr. 21, 2017) [Docket No. 234] (approving $250,000 break-up fee plus up to $200,000 in expense reimbursement equal to approximately 5% of the purchase price in connection with $8 million sale); *In re Phoenix Brands LLC*, Case No. 16-11242 (BLS) (Bankr. D. Del. June 8, 2016) [Docket No. 136] (approving break-up fee and expense reimbursement equal to 5.3% of the purchase price); *In re Nortel Networks Inc.*, Case |

No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee and up to $400,000 expense reimbursement in connection with $17.65 million sale, or 5.9% of the total purchase price); *In re Tallygenicom, L.P.*, Case No. 09-10266 (CSS) (Bankr. Del. Feb. 19, 2009) (approving $750,000 break-up fee and up to $750,000 expense reimbursement in connection with $36.6 million sale, or approximately 4.1% of the purchase price).

The Committee also argues that the Bid Protections should not be given superpriority status.  This Court routinely grants superpriority administrative expense status to break-up fees and expense reimbursements where, as here, such bid protections are found to be actual and necessary costs of preserving the estate.  *See, e.g., Exide Holdings, Inc.*, Case No. 20-11157 (CSS) [D.I. 344]; *In re Southcross Energy Partners, L.P.*, Case No. 19-10702 (MFW) (Bankr. D. Del. Jun 13, 2019) [D.I. 324] ("[A]ny Break-Up Fee or Expense Reimbursement provided pursuant to the Stalking Horse Order shall constitute allowed superpriority administrative expense claims…"); *Things Remembered,* Case No. 19-10234 (KG) [D.I. 150]; *In re Scottish Holdings, Inc.,* Case No. 18- 10160 (LSS) (Bankr. D. Del. Feb. 28, 2018) [D.I. 119] ("The Break-Up Fee and the Expense Reimbursement Amount shall constitute superpriority administrative expenses of the Debtors with priority over any and all administrative expenses of any kind…"); *In re Radioshack*, Case No. 17-10506 (Bankr. D. Del. Jul. 5, 2017) (BLS) [D.I. 784] ("The Buyer's Expense Reimbursement and Break–Up Fee shall be deemed to be administrative expenses under Section 503 of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code."); *In re Golfsmith International Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Dec. 13, 2016) [D.I. 548] ("The Stalking Horse Bidder shall have an allowed administrative claim for any amounts payable to it in connection with the Debtors' obligations to pay the Break-Up Fee. Such administrative claim shall have priority over any and all administrative expenses…"); *In re Empire Generating Co,* LLC, Case No. 19-23007 (Bankr. S.D.N.Y. (Jun. 10, 2019) [D.I. 99] ("The

| | Break-Up Fee and Expense Reimbursement shall constitute an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative priority claims."). |
|---|---|
| A section 363(m) good faith finding should not be made at this time.<br><br>UCC Objection ¶¶47-48 | The Bidding Procedures Order includes "good faith" findings regarding the negotiation of the Bidding Procedures, Bid Protections, and Stalking Horse Agreement (see Bidding Procedures Order, recital F and J). However, the Bidding Procedures Order makes no reference to section 363(m). Section 363(m) findings will be part of any later sale order approving the sale of assets. |
| No waiver of the stay in Bankruptcy Rules 6004(h) and 6006(d).<br><br>UCC Objection ¶¶49-51 | The Committee has not articulated any basis not to waive the stays in Bankruptcy Rules 6004(h) and 6006(d). The Committee argues there is no business exigency. For the reasons set forth in the Reply and in this chart, the Debtors have indeed articulated the exigencies and tight timeline they are operating under to complete a sale process, given their limited liquidity and operational constraints. |
| Additional Bid Procedures that are objectionable.<br><br>UCC Objection ¶52.<br><br>- Eliminate the requirement that prospective bidders provide proof of financial wherewithal before receiving access to the data room and due diligence information.<br><br><br>- Other requested modifications. | <br><br><br><br>This requirement is standard in many bid procedures and is subject to the Debtors' business judgment and discretion. The Debtors only want serious, committed potential buyers and do not want to be distracted by parties without sufficient financial means to participate in the process, which wastes time, effort, and limited resources in these chapter 11 cases.<br><br>With respect to these objection points, the Debtors have certain discretion to modify the Bidding Procedures to maintain flexibility and to maximize value. The Debtors are willing to discuss certain modifications with the Committee prior to the Auction. |